Filed 7/26/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JANICE DICKINSON, | B291701 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC580909) |
| v. | |
| WILLIAM H. COSBY, JR., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. Randolph M. Hammock, Judge. Affirmed.

The Bloom Firm, Lisa Bloom, Franklin L. Ferguson, Jr., and Alan Goldstein for Plaintiff and Respondent.

Greenberg Gross, Alan A. Greenberg, Wayne R. Gross, and Sarah Kelly-Kilgore for Defendant and Appellant.

_____

In 2014, plaintiff Janice Dickinson publicly alleged that defendant William Cosby drugged and raped her in 1982. Cosby responded by issuing a demand letter and several press releases through his attorney, which expressed or implied that Dickinson was lying. Dickinson filed a complaint against Cosby for defamation and related causes of action, which Cosby moved to strike under Code of Civil Procedure section 425.16 (the anti-SLAPP statute).[1] The trial court granted Cosby's motion in part, which we subsequently reversed in *Dickinson v. Cosby* (2017) 17 Cal.App.5th 655 (*Dickinson I*). We concluded that none of Dickinson's claims were barred by the anti-SLAPP statute.

On remand, Cosby filed a second anti-SLAPP motion seeking to strike claims newly asserted in Dickinson's first amended complaint. The trial court granted the motion in substantial part, but refused to strike Dickinson's claims premised on two allegedly defamatory statements appearing in press releases issued by Cosby's attorney.

Cosby contends the trial court erred in declining to grant his motion in full. He argues that Dickinson cannot show he is directly or vicariously liable for his attorney's statements. He also argues the allegedly defamatory statements were his attorney's nonactionable opinions and did not refer, directly or indirectly, to Dickinson. We disagree and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND[2]**

During a nationally televised *Entertainment Tonight*

---

[1]   All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[2]   We take some of the background facts from our prior opinion in this case, *Dickinson I, supra,* 17 Cal.App.5th 655.

interview that aired on November 18, 2014, Dickinson, a successful model and television personality, accused Cosby, a successful comedian and actor, of drugging and raping her in 1982.  After the interview went public, Cosby's attorney, Martin Singer, sent a demand letter to the executive producer of *Good Morning America*, with similar letters to other media outlets. The body of the letter states, among other things, "We are writing regarding the planned *Good Morning America* segment interviewing Janice Dickinson regarding the false and outlandish claims she made about Mr. Cosby in an *Entertainment Tonight* interview, asserting that he raped her in 1982 (the 'Story').  That Story is fabricated and is an outrageous defamatory lie."

The next day, November 19, 2014, Singer issued a press release, with the heading,

**"STATEMENT OF MARTIN D. SINGER**
**ATTORNEY FOR BILL COSBY"**

The body of the press release asserts, among other things, "Janice Dickinson's story accusing Bill Cosby of rape is a lie," and "Documentary proof and Ms. Dickinson's own words show that her new story about something she now claims happened back in 1982 is a fabricated lie."

Around this time, several other women, including Linda Traitz, also accused Cosby of sexual misconduct.  In response to Traitz's allegations, on November 20, 2014, Singer issued a press release, which was headed,

**"STATEMENT BY MARTIN D. SINGER**
**ATTORNEY FOR BILL COSBY**
**REGARDING LINDA JOY TRAITZ"**

The statement reads, in its entirety, as follows:

3

"Ms. Traitz is the latest example of people coming out of the woodwork with fabricated or unsubstantiated stories about my client.

"Linda Joy Traitz is making ridiculous claims and suddenly seems to have a lot to say about a fleeting incident she says happened with my client more than 40 years ago, but she hasn't mentioned either her 3 1/2 year incarceration or her extensive criminal record with charges spanning from the 1980's through 2008.

"For the first time, she is claiming that in approximately 1970, my client supposedly drove her to the beach and had a briefcase filled with drugs and offered her pills to relax, which she says she turned down and demanded to be taken home after Mr. Cosby came on to her. There was no briefcase of drugs, and this is an absurd fabrication.

"Ms. Traitz's long criminal record for numerous offenses including charges for criminal fraud, possession of Oxycodone, cocaine possession, marijuana possession, and possession of drug paraphernalia, speaks for itself.

"As the old saying goes, 'consider the source.' "

On November 21, 2014, Singer issued a third press release, which was headed,

**"STATEMENT BY MARTIN D. SINGER**
**ATTORNEY FOR BILL COSBY"**

The statement reads, in its entirety, as follows:

"The new, never-before-heard claims from women who have come forward in the past two weeks with unsubstantiated, fantastical stories about things they say occurred 30, 40, or even 50 years ago have escalated far past the point of absurdity.

"These brand new claims about alleged decades-old events are

4

becoming increasingly ridiculous, and it is completely illogical that so many people would have said nothing, done nothing, and made no reports to law enforcement or asserted civil claims if they thought they had been assaulted over a span of so many years.

"Lawsuits are filed against people in the public eye every day. There has never been a shortage of lawyers willing to represent people with claims against rich, powerful men, so it makes no sense that not one of these new women who just came forward for the first time now ever asserted a legal claim back at the time they allege they had been sexually assaulted.

"This situation is an unprecedented example of the media's breakneck rush to run stories without any corroboration or adherence to traditional journalistic standards.  Over and over again, we have refuted these new unsubstantiated stories with documentary evidence, only to have a new uncorroborated story crop up out of the woodwork.  When will it end?"

### *Demands for Retraction*

On February 2, 2015, Dickinson's counsel, Lisa Bloom, sent several Cosby attorneys, including Singer, a letter seeking retraction of both the November 18 demand letter and November 19 press release.  Bloom argued that Singer's statements on behalf of Cosby had defamed Dickinson and harmed her reputation, and she demanded Cosby "immediately publicly correct the record to restore [Dickinson's] reputation."

On December 24, 2015, Bloom sent additional letters to Cosby's attorneys, as well as Singer's attorney, demanding retraction of the November 20 and 21 press releases.

Neither Cosby nor Singer retracted the statements.

### *Dickinson's Original Complaint*

On May 20, 2015, Dickinson filed a complaint against Cosby for defamation and related causes of action.[3]  Her complaint alleged that Cosby had drugged and raped her, which she disclosed publicly in 2014.  "In retaliation, Cosby, through an attorney, publicly branded her a liar and called her rape disclosure a lie with the intent and effect of revictimizing her and destroying the professional reputation she's spent decades building."

Dickinson's complaint alleged that Singer's November 18 demand letter and November 19 press release were defamatory. She also alleged that Cosby "issued" and "published" both statements, through his attorney, which were republished by thousands of media entities worldwide as Cosby "foresaw and intended."

Dickinson pleaded that Cosby's refusal to retract the statements after having been provided with evidence confirming that her claims were not fabricated "constitutes actual malice." She also argued that failure to retract "constitutes [Cosby's] acceptance, endorsement and ratification" of Singer's statements.

Dickinson did not assert any claims based on the November 20 and 21 press releases.

---

[3]     In addition to defamation, the original complaint and operative first amended complaint stated causes of action for false light and intentional infliction of emotional distress.  The trial court ultimately struck Dickinson's intentional infliction of emotional distress claim and sustained a demurrer to her false light claim.  Dickinson does not challenge those orders on appeal, so we need not discuss the causes of action further.

### *Cosby's First Anti-SLAPP Motion*

On June 22, 2015, Cosby filed an anti-SLAPP motion seeking to strike Dickinson's entire complaint. Among other things, Cosby argued that Dickinson could not prevail on her defamation claims because the allegedly defamatory statements were protected by the litigation privilege and were nonactionable opinions.

Cosby also put forth a series of arguments based on the fact that the statements had been made by Singer, rather than Cosby himself. Cosby argued that he could not be held liable for Singer's conduct without evidence that he furnished or approved the statements, and a failure to retract is not sufficient. He further argued that since Dickinson is a public figure, she could only prevail on her defamation cause of action if she established actual malice. He claimed that Singer had not acted with actual malice; and that, even if he had, Singer's malice could not be imputed to him as Singer's principal via respondeat superior.

As Cosby's anti-SLAPP motion had put Singer's malice into question, Dickinson moved to lift the automatic discovery stay (§ 425.16, subd. (g)) to depose Cosby and Singer on the issue. After considerable litigation, the trial court indicated that, prior to allowing such discovery, it would first determine whether Dickinson had a reasonable probability of establishing the elements of her defamation action other than actual malice.

On March 8, 2016, in an apparent bid to entirely remove the malice issue from consideration, Cosby filed a supplemental brief in the trial court stating he was no longer "pursuing on this Special Motion to Strike the arguments advanced in the opening brief regarding agency and actual malice."

7

### *Dickinson's First Amended Complaint*

While Cosby's original anti-SLAPP motion was pending, Dickinson filed a first amended complaint (FAC), which added Singer as a defendant. In addition, the FAC newly alleged that Cosby is liable for defamatory statements contained in the November 20 and 21 press releases. It also added explicit allegations that Cosby is both directly and vicariously liable for publishing the demand letter and press releases. The trial court struck the FAC on procedural grounds.

### *Order and Appeal on Cosby's First Anti-SLAPP Motion*

The trial court in part granted Cosby's original anti-SLAPP motion. It found the November 18 demand letter was subject to the litigation privilege, which defeated all of Dickinson's claims based on the letter. However, the court determined Dickinson showed a probability of prevailing on her claims premised on the November 19 press release.

Cosby and Dickinson filed cross appeals to the court's order, which we resolved in *Dickinson I, supra,* 17 Cal.App.5th 655. On appeal, Cosby briefed the issues of malice and agency on the merits. We declined to address the arguments, however, given he had withdrawn them before the trial court. (*Id*. at p. 675.) We noted that Cosby did not argue that his anti-SLAPP motion should be reconsidered after Dickinson was permitted to conduct limited discovery. (*Id*. at p. 673, fn. 6.)

As to the remaining issues, we concluded Dickinson made a sufficient showing of probability of success of prevailing on the merits of all her defamation claims, and the trial court erred in finding the litigation privilege defeated her claims related to the November 18 demand letter. (*Dickinson I, supra*, 17 Cal.App.5th

8

at pp. 681, 685.) We also concluded the trial court erred in striking the FAC. (*Id.* at p. 676.) As a result, the FAC became operative when this court issued a remittitur.

### Cosby's Second Anti-SLAPP Motion

On May 15, 2018, Cosby filed a new anti-SLAPP motion seeking to strike the FAC. With respect to the first prong of the anti-SLAPP procedure, Cosby argued the demand letter and press releases were protected speech in connection with a public issue. As to the second prong—whether Dickinson can demonstrate a probability of prevailing on her claims—Cosby argued that Dickinson could not establish he was directly or vicariously liable for any of Singer's statements, because the requisite evidence to establish such liability, if it exists, is protected by the attorney-client privilege. Cosby further argued Dickinson could not prevail on her claims premised on the November 20 and 21 press releases because they did not concern her and were nonactionable statements of opinion.

### Singer's Anti-SLAPP Motion

The same day Cosby filed his second anti-SLAPP motion, Singer filed his own anti-SLAPP motion. Singer asserted, among other things, that Dickinson could not show a probability of prevailing on her claims because she could not demonstrate that he acted with actual malice.

Singer filed a declaration in support of his motion in which he described his investigation of Dickinson's allegations and the basis for the various statements in the demand letter and press releases. Singer explained that he personally believed Dickinson had fabricated her allegations about Cosby based on his review of her autobiography, his Internet research, and his personal experiences dealing with her on a prior case.

9

Singer further explained that, on "November 18, 2014—before issuing a statement or responding to any inquiries from the media about Ms. Dickinson's allegations to *Entertainment Tonight*—I discussed her allegations to *Entertainment Tonight* directly with Mr. Cosby and with his transactional attorney, Mr. Schmitt. Because Mr. Cosby has declined to waive the attorney-client privilege, I believe that I am prevented by law from disclosing the substance of those conversations with Messrs. Cosby and Schmitt."

Singer also said he had "been practicing law for more than 40 years. It is my general practice to ensure that any correspondence or press statement that I issue on behalf of a client is approved by the client before it is transmitted to the intended recipient or recipients, which includes confirming with the client the veracity of the correspondence's or statement's substance." Singer did not indicate whether he deviated from this general practice with regards to the demand letter and press releases.

***Dickinson's Opposition to Cosby's Second Anti-SLAPP Motion***

In opposition to Cosby's motion, Dickinson focused on showing a probability of prevailing on the merits of her claims. She asserted that Cosby is vicariously liable for Singer's actions, whom she could prove acted with malice. Alternatively, she asserted Cosby authorized and ratified Singer's statements accusing her of lying about Cosby raping her, despite knowing the allegations were true. Dickinson further argued the November 20 and 21 press releases referred to her and contained multiple, provably false factual assertions that caused her injury.

10

In support of her opposition, Dickinson submitted her own declaration in which she asserted Cosby drugged and raped her in 1982. According to Dickinson, sometime that same year, she told a friend what Cosby had done. She also privately disclosed the incident to three people in 1999 and 2001, and pushed to have it included in her autobiography.

Dickinson also supported her opposition with excerpts from Singer's deposition. During his deposition, Singer testified that, on November 18, 2014, he learned about Dickinson's *Entertainment Tonight* interview from Cosby's publicist, David Brokaw. Singer and Brokaw proceeded to have multiple phone calls that afternoon. Cosby participated in at least one of those calls. Singer also believed Cosby's transactional lawyer may have been on one of the calls with Brokaw and Cosby. Singer said he did not have discretion to independently respond to media inquiries regarding Dickinson's allegations.

Singer explained that he intended the November 20 press release to refer only to Traitz. However, he conceded that Dickinson would have been an "earlier example" of someone "coming out of the woodwork" to accuse Cosby of sexual assault. Singer also said he intended to refer to Dickinson in the November 21 press release when he wrote, "The new never-before-heard claims from women who have come forward in the past two weeks with unsubstantiated fantastical stories about things they say occurred 30, 40, or even 50 years ago have escalated far past the point of absurdity."

Singer said his representation of Cosby ended in 2015, sometime after he received Dickinson's February 2015 request for retraction.

### *Trial Court Order*

The trial court heard and decided Singer's and Cosby's anti-SLAPP motions simultaneously.  The court granted Singer's motion in its entirety on the basis that Dickinson could not prove he acted with malice, which was a necessary element of her claims.  The court explained:

"The only way Plaintiff could prove by clear and convincing evidence that Singer and/or Cosby acted with the requisite malice against Plaintiff (as a public figure) would be to show that Singer knew or acted in reckless disregard of whether the rape actually occurred, because the gist of his defamatory statements is that Plaintiff is lying about a rape that never happened.  Because Singer was not present during the alleged rape, the only way he could know would be that Cosby communicated to Singer that he did in fact rape Dickinson as she claims.  However, evidence of this communication from Cosby to Singer comes within the attorney-client privilege (and only Cosby, as client, can waive the privilege), and any documents reflecting Singer's conclusions about Cosby's innocence come within the absolute attorney work product doctrine protecting writings reflecting 'an attorney's impression, conclusions, opinions or legal research or theories,' which writings are '**not discoverable under any circumstances**.' CCP § 2018.030 (Bold emphasis added).  Thus, Dickinson cannot obtain this information in discovery . . . ."

The court then turned to Cosby's anti-SLAPP motion, which it granted in part and denied in part.  The court began by noting the limited scope of the motion:  "By way of this motion, Cosby is only challenging whether the November 20, 2014 and November 21, 2014 press statements are actionable, as the Court of Appeal has already directed this trial court that Cosby's anti-

12

SLAPP motion as to the November 18 and November 19, 2014 Press Statements are to be denied."

The court determined that all the allegedly defamatory statements in the November 20 and 21 press releases were protected acts in furtherance of Cosby's constitutional right of free speech. It then considered the second prong of the anti-SLAPP analysis: whether Dickinson had established a probability of prevailing on the merits of her claims.

The court rejected Cosby's argument that the press releases were not "of and concerning" Dickinson. The court explained that the statements were "issued as a series of Press Statements within 1–2 days of the November 18 and November 19, 2014 Press Statements which specifically referred to Plaintiff by name. There is a clear implication that Singer is referring to persons such as Dickinson who, only 1–2 days prior, he stated was lying about Cosby raping her."

The court then considered whether the press releases contained provably false factual assertions. With respect to the November 20 press release, the court found all the statements were nonactionable opinion, with one exception: "Ms. Traitz is the latest example of people coming out of the woodwork with unsubstantiated or fabricated stories about my client."

Similarly, the court found all but one statement in the November 21 press release to be nonactionable opinion: "The new, never-before-heard claims from women who have come forward in the past two weeks with unsubstantiated, fantastical stories about things they say occurred 30, 40, or even 50 years ago have escalated far past the point of absurdity."

13

Finally, the court rejected Cosby's argument that Dickinson could not establish direct or vicarious liability with respect to any of her claims. The court explained:

"[T]he evidence before the Court is that Plaintiff has demonstrated a probability that she can prove that Cosby ratified two statements made by Singer on behalf of Cosby as his agent because Cosby approved the November 18, 2014 Press Statement before it was publicly issued by Singer. As discussed above re: Defendant Singer's anti-SLAPP motion, Singer stated in his declaration that he ran the November 18, 2014 Press Release by Cosby and his attorney for approval before publishing that Press Statement. . . .

"The Court also notes that this is clear and convincing evidence that Cosby acted with malice in approving the November 18 (and, by implication, November 19), 2014 Press Statements issued by Singer. The fact that the Court found that Plaintiff has not established a probability that she can prove by clear and convincing evidence that Singer acted with malice does not automatically let Cosby off the hook. Because Cosby is one of only two people who was involved in the incident, he necessarily knows whether the statement that Dickinson lied about the rape because the rape never happened is true or false. Dickinson has submitted evidence that the rape occurred. . . .

"While there is no evidence that Singer asked Cosby to specifically approve the November 20 and 21, 2014 Press Statements, as with the November 19, 2014, Cosby may be found by the jury to have implicitly approved any Press Statements whereby Singer denied on Cosby's behalf Plaintiff's accusation that Cosby had raped her. This would constitute Cosby's ratification of the November 20 and 21, 2014 Press Statements

14

which furthered this position taken by Cosby."

Cosby timely appealed.

## DISCUSSION

### I. We Decline to Consider Cosby's Arguments Related to the November 18 Demand Letter and November 19 Press Release

Dickinson urges us to disregard Cosby's arguments that she failed to show a probability of prevailing on her claims premised on the November 18 demand letter and November 19 press release. She contends this court determined that issue in her favor in *Dickinson I*, and Cosby is improperly seeking a second bite at the apple by challenging those claims in his latest anti-SLAPP motion. We agree.

" 'The doctrine of "law of the case" deals with the effect of the *first appellate decision* on the subsequent *retrial or appeal*: The decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case.' " (*Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491.) The doctrine "precludes a party from obtaining appellate review of the same issue more than once in a single action." (*Katz v. Los Gatos– Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 62; see *Searle v. Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 434 ["The rule of 'law of the case' generally precludes multiple appellate review of the same issue in a single case."].) "The law of the case may apply even where the appeal is from a decision short of a full trial, including a judgment on a demurrer, a nonsuit order or denial of an anti-SLAPP motion." (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th

15

336, 356.)

In *Dickinson I*, we held that Dickinson's defamation claims premised on the November 18 demand letter and November 19 press release are not barred under the anti-SLAPP statute. (See *Dickinson I, supra,* 17 Cal.App.5th at p. 660.) That determination became law of the case, which, in effect, precludes Cosby from relitigating the issue. As a result, we will not consider Cosby's arguments related to those claims, and will instead limit our review to his arguments related to the November 20 and 21 press releases, which were not at issue in *Dickinson I.*

Cosby maintains his arguments related to the November 18 demand letter and November 19 press release are proper because they are premised on new allegations in the FAC. Specifically, he argues the FAC alleges he is both directly and vicariously liable for such statements, whereas the original complaint asserted only that he is vicariously liable for them.

We do not read the original complaint so narrowly. It repeatedly alleged that *Cosby* "published" and "issued" the allegedly defamatory statements through his attorney, which were then republished worldwide as *Cosby* "foresaw and intended." The clear implication of such allegations is that Cosby personally took a responsible part in the publication of the statements, for which he would be directly liable. (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 712 ["One who takes a responsible part in a publication of defamatory material may be held liable for the publication."].) The original complaint further alleged that Cosby ratified the allegedly defamatory statements, which would also potentially expose him to direct liability. (See Rest.3d Agency,

16

§ 7.03 ["A principal is subject to direct liability to a third party harmed by an agent's conduct when . . . the principal ratifies the agent's conduct . . . ."].)  Thus, we reject Cosby's contention that the FAC's claims related to the November 18 demand letter and November 19 press release are meaningfully different from those in the original complaint.

Cosby also perfunctorily argues that we should reconsider his challenge to Dickinson's claims now that Singer has been "absolved" of liability.  Once again, we are not persuaded.  Cosby was free to argue in his first anti-SLAPP motion that Dickinson could not establish Singer's liability.  In fact, he did make that argument, but ultimately abandoned it in an apparent bid to avoid discovery on the malice issue.  Cosby chose not to pursue that argument in his first anti-SLAPP motion.  He must live with that choice now.

## II. The Trial Court Properly Denied Cosby's Anti-SLAPP Motion

### A.  The Anti-SLAPP Statute

The Legislature enacted the anti-SLAPP statute to address the societal ills caused by meritless lawsuits filed to chill the exercise of First Amendment rights.  (§ 425.16, subd. (a).)  The statute accomplishes this end by providing a special procedure for striking meritless, chilling claims at an early stage of litigation.  (See § 425.16, subd. (b)(1); *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055–1056.)

The anti-SLAPP statute establishes a two-step procedure to determine whether a claim should be stricken.  In the first step, the court decides whether the movant has made a threshold showing that a challenged claim arises from statutorily-defined

17

protected activity.[4]  (*Rusheen v. Cohen, supra*, 37 Cal.4th at p. 1056.)  Here, the parties agree, as do we, that Dickinson's defamation claims arise from protected activities.  We focus, therefore, on the second prong of the analysis:  whether Dickinson has shown of probability of prevailing on her claims. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.)

To show a probability of prevailing, the opposing party must demonstrate the claim is legally sufficient and supported by a sufficient prima facie showing of evidence to sustain a favorable judgment if the evidence it has submitted is credited.  (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 965.)  "In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. [Citation.]' [Citations.]" (*Taus v. Loftus* (2007) 40 Cal.4th 683,

_____

[4]      The anti-SLAPP statute specifies four categories of protected activity:  "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e).)

18

713–714.) We accept as true the evidence favorable to the plaintiff. Further, a plaintiff must establish only that the challenged claims have minimal merit to defeat an anti-SLAPP motion. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291.)

We review the denial of an anti-SLAPP motion de novo. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.)

### B. Defamation

"Defamation is the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or that causes special damage." (*Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 486.) If the person defamed is a public figure, like Dickinson, she must show, by clear and convincing evidence, that the defamatory statement was made with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false. (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256; *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 285–286 (*Sullivan*).) In evaluating whether a plaintiff has made a prima facie showing of facts sufficient to sustain a favorable judgment, "we bear in mind the higher clear and convincing standard of proof." (*Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 358.)

### C. There Is Sufficient Evidence Showing Cosby Is Directly Liable for the Allegedly Defamatory Statements Contained In the November 20 and 21 Press Releases

Cosby contends Dickinson failed to show a probability of prevailing on her claims because she cannot prove he is directly liable for any of the allegedly defamatory statements contained in

19

the press releases.  He argues there is no evidence that he played a responsible part in their publication, nor could Dickinson obtain such evidence because it would be protected by the attorney-client privilege.  We disagree.

### 1. There Is Sufficient Evidence Showing Cosby Approved or Authorized the Statements

"One who takes a responsible part in a publication of defamatory material may be held liable for the publication." (*Overstock.com, Inc. v. Gradient Analytics, Inc., supra*, 151 Cal.App.4th at p. 712.)  Here, there is sufficient evidence that Cosby took a responsible part in publishing each of the allegedly defamatory statements by approving or authorizing them prior to publication.

Singer stated in his declaration that he has been practicing law for 40 years, and it is his general practice to discuss the contents of all correspondences and press statements with a client and receive approval before transmitting them to the intended recipients.  He further testified at deposition that he did not have discretion to independently respond to media inquiries regarding Dickinson's disclosure.  From this evidence, the fact finder could reasonably infer that Singer sought and received Cosby's approval or authorization of the press releases before they were issued.  (See Evid. Code, § 1105 ["evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom"].)  Further supporting such an inference, the evidence shows Cosby continued to employ Singer and declined to issue retractions after Singer published the various statements, which Cosby knew to contain falsehoods.  A trier of fact could reasonably find such behavior inconsistent with a claim that Singer was acting without Cosby's approval or

20

authorization.  Although far from overwhelming, this evidence is sufficient to meet the minimal burden of proof required to survive an anti-SLAPP statute.

Cosby contends Singer's testimony regarding his general practices is insufficient to prove he approved or authorized the allegedly defamatory statements, because there is no evidence that Singer "applied those practices in the course of representing [Cosby] or in making the Singer Statements."  Evidence Code section 1105, however, provides that "evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom."  Thus, the fact finder could properly infer that Singer acted in conformance with his general practices when issuing these specific press releases.  If so, Singer would have sought and received Cosby's approval or authorization before issuing the various statements.  Cosby does not acknowledge Evidence Code section 1105 in his briefing, let alone explain why it does not apply to this case.

Cosby additionally asserts that Dickinson cannot rely on evidence of Singer's general practices because it would require the trier of fact to draw an inference about the contents of privileged conversations.[5]  Assuming for the sake of argument that such an inference is improper, we are not convinced it would be necessary in this case.  Singer testified that, around the time he issued the press releases, he had at least one conversation with Cosby in the presence of a third party, David Brokaw.  If Cosby approved or otherwise authorized Singer's statements during that conversation—which would have been reasonable given Brokaw was Cosby's publicist and first alerted Singer to

---

[5]  Cosby does not contend that Singer's declaration itself contains privileged information.

21

Dickinson's disclosure—the communication may not be privileged.[6]  It is possible, therefore, that Dickinson could prove Cosby played a responsible part in the publication of the allegedly defamatory statements without having to prove— through either direct or indirect evidence—the contents of a privileged communication.

For similar reasons, we find no merit to Cosby's brief suggestion that Dickinson's use of evidence of Singer's general practices is improper because it would require Cosby to waive the attorney-client privilege to defend himself.  Cosby overlooks that he could potentially defend himself by producing evidence of non-privileged communications in which he explicitly disapproved the statements or otherwise forbade Singer from issuing them.  Cosby could also potentially produce evidence that Singer never sought his approval or authorization, and acted entirely on his own.  The attorney-client privilege protects confidential *communications* between attorneys and their clients.  (*Roberts v. City of Palmdale* (1993) 5 Cal.4th 363, 371; see also Evid. Code, § 954.)  Thus, revealing that a particular communication did not occur would not necessarily result in a waiver of the privilege.

---

[6]     Cosby does not contest that Brokaw's presence would break the attorney-client privilege.  Instead, he contends that Singer's declaration conclusively establishes that Brokaw was not present during any of the discussions between Cosby and Singer regarding Dickinson's allegations.  Singer's declaration, however, states only that he discussed the allegations "directly with Mr. Cosby and with his transactional attorney . . . ."  It does not specify whether other people, such as Brokaw, were present during those conversations.

## 2.  There Is Sufficient Evidence Showing Cosby Ratified the Allegedly Defamatory Statements

Even if Dickinson could not prove Cosby approved or authorized the press releases before Singer issued them, she produced sufficient evidence showing Cosby ratified the statements after the fact.  "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him.  [Citations.]  A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.' " (*Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73.)  "[T]he effect of a ratification is that the authority which is given to the purported agent relates back to the time when he performed the act." (*Ibid.*; see *C.R. v. Tenet Healthcare Corp.* (2009) 169 Cal.App.4th 1094, 1111 ["the ratification relates back to the time the tortious act occurred"]; Rest.3d Agency, § 4.02 ["ratification retroactively creates the effects of actual authority"].)  A principal's failure to discharge an agent after learning of his wrongful acts may be evidence of ratification.  (*Delfino v. Agilent Technologies, Inc.* (2006) 145 Cal.App.4th 790, 810; *Murillo v. Rite Stuff Foods, Inc.* (1998) 65 Cal.App.4th 833, 852.)

Here, Dickinson presented evidence that Cosby drugged and raped her in 1982.  Assuming this evidence is true—as we must for purposes of an anti-SLAPP motion—it follows that Cosby knew the press releases, which implied Dickinson was

23

lying, contained falsehoods. Given Singer was Cosby's attorney and represented himself as such in the press releases, it is reasonable to infer that Cosby also expected the statements contained therein would be attributed to him. Nonetheless, the evidence shows Cosby did not immediately terminate the agency relationship with Singer after he issued the press releases; nor did Cosby issue a retraction or clarification.

A fact finder could reasonably conclude such actions were inconsistent with any reasonable intention on Cosby's part, other than to approve and adopt Singer's statements as his own. If so, the effect is as if Cosby had approved or authorized the statements at the time Singer issued them. Cosby would therefore be responsible for their publication and subject to direct liability for defamation. (See Rest.3d Agency, § 7.03 ["A principal is subject to direct liability to a third party harmed by an agent's conduct when . . . the principal ratifies the agent's conduct . . . ."].)

Cosby suggests the legal principle of ratification has no application to this case because it applies only if there is no pre-existing agency relationship. He is wrong. Although it is true that ratification may result in the creation of an agency relationship where none previously existed, it also works to authorize an existing agent's otherwise unauthorized act. (*Rakestraw v. Rodrigues, supra*, 8 Cal.3d at p. 73.)

We are also not persuaded by Cosby's contention that post-publication conduct can never be sufficient to show a defendant played a responsible part in the publication of defamatory material. In support, Cosby relies on a federal case in which a district court noted the lack of authority to support the plaintiffs' argument "that a publisher may be liable for defamation because

24

it fails to retract a statement upon which grave doubt is cast after publication." (*D.A.R.E. America v. Rolling Stone Magazine* (C.D.Cal. 2000) 101 F.Supp.2d 1270, 1287.) The lack of authority for such a proposition is irrelevant given Cosby is Singer's principal, not his publisher, and the evidence shows Cosby knew the statements were false at the time they were published.

Cosby's reliance on *Sullivan, supra,* 376 U.S. 254, is also misplaced. In that case, the United States Supreme Court held a newspaper publisher's failure to retract an article upon demand was not sufficient to show the publisher acted with malice. (*Id.* at p. 286.) Here, Dickinson is not relying on evidence of Cosby's failure to retract to show he acted with malice. Rather, she is using it to show Cosby ratified the statements and is therefore responsible for their publication.

Equally misguided is Cosby's argument that Dickinson failed to produce evidence of "confirmatory conduct," which he suggests is necessary to prove ratification. Cosby overlooks that a principal may ratify an agent's act through either " 'confirmatory conduct' " or " 'conduct inconsistent with disapproval.' " (*Gates v. Bank of America* (1953) 120 Cal.App.2d 571, 576.) As discussed above, a fact finder could reasonably find Cosby's retention of Singer as his attorney and refusal to issue retractions are inconsistent with disapproval of the allegedly defamatory statements.[7]

---

[7] Because we find Dickinson showed a probability of prevailing under a direct liability theory, we need not consider whether she might also prevail under a vicarious liability theory.

25

**D. Dickinson Produced Sufficient Evidence Showing the November 20 and 21 Press Releases Were of and Concerning Her**

Cosby maintains Dickinson cannot prevail on her claims premised on the November 20 and 21 press releases because neither press release was "of and concerning her." We disagree.

**1. Applicable Law**

An otherwise defamatory statement is actionable only if it is "of and concerning" the plaintiff. "The 'of and concerning' or specific reference requirement limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe cause them some hurt." (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1044 (*Blatty*).) To satisfy the requirement, the plaintiff must show the statement expressly mentions her or refers to her by reasonable implication. (*Id.* at p. 1046.) The plaintiff must also show the statement was understood by at least one third person to have concerned her. (*Bartholomew v. YouTube, LLC* (2017) 17 Cal.App.5th 1217, 1231; see *Neary v. Regents of University of California* (1986) 185 Cal.App.3d 1136, 1147 ["For publication to occur the defamatory matter must be communicated to a third party who understands the defamatory meaning and its applicability to the plaintiff."].)

A statement may be actionable if it refers to a group to which the plaintiff belongs, but only if the group is sufficiently small and its members easily ascertainable. (*Blatty, supra,* 42 Cal.3d at p. 1046.) Where the statement refers to a large group—typically any group numbering more than 25 members—courts consistently hold that plaintiffs cannot show the

26

statements were of and concerning them. (*Ibid*.)

To determine whether the allegedly defamatory statements are of and concerning Dickinson, we must consider the totality of the circumstances. (See *D.A.R.E. America v. Rolling Stone Magazine*, *supra*, 101 F.Supp.2d at p. 1290 [applying California law].) This requires examination of the "nature and full content of the communication and . . . the knowledge and understanding of the audience to whom the publication was directed." (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 261 (*Baker*).)

### 2. Application

Dickinson's claims premised on the November 20 and 21 press releases are considerably weaker than her claims premised on the demand letter and November 19 press release, which referred to her directly. In fact, it is not clear why she chose to add the claims to her FAC, especially given the relative strength of her existing claims. Nonetheless, and although far from a certainty, we think a reasonable trier of fact could conclude the allegedly defamatory statements contained in each refers to Dickinson by reasonable implication.

The first allegedly defamatory statement—"Ms. Traitz is the latest example of people coming out of the woodwork with fabricated or unsubstantiated stories about my client"—appears in the November 20 press release. Singer issued the press release in the immediate wake of numerous women publicly accusing Cosby of sexual misconduct, which was a topic of considerable public interest. The press release itself was concerned primarily with discrediting one such woman's recent allegation that Cosby offered her drugs and made sexual advances on her decades ago. In this context, it is reasonable to read the reference to "stories about my client" to refer specifically

27

to accusations of Cosby's sexual misconduct. Further, the phrase "coming out of the woodwork" suggests the accusers had not previously made their disclosures public. Thus, the statement could be reasonably interpreted as referring specifically to the women who recently publicly accused Cosby of sexual misconduct, and implying that their accusations were false.

Dickinson undoubtedly fits that description, a point even Singer acknowledged during his deposition. Just two days before Singer issued the November 20 press release, she went on national television to accuse Cosby of drugging and raping her. The next day, Singer issued the November 19 press release, which explicitly called Dickinson's "story" that Cosby raped her a "fabricated lie." Given this timeline of events, the significant publicity surrounding Dickinson's allegations and Cosby's response, and the similarities in language with the November 19 press release, we think a reasonable fact finder could conclude that Dickinson was one of the earlier "example[s] of people coming out of the woodwork" with "fabricated" "stories about [Cosby]" to which the November 20 statement implicitly referred.

For the same reasons, we think a reasonable trier of fact could conclude the allegedly defamatory statement in the November 21 press release—"The new, never-before-heard claims from women who have come forward in the past two weeks with unsubstantiated, fantastical stories about things they say occurred 30, 40, or even 50 years ago have escalated far past the point of absurdity"—is also of and concerning Dickinson. Indeed, the statement includes additional details that further delineate the group and point even more directly to Dickinson.

We acknowledge that the record does not disclose the precise number of women who had recently accused Cosby of sexual misconduct.[8]  Still, we do not think the group is necessarily so large, or its boundaries so amorphous, that its members could not be readily ascertained.  This is particularly true given the public nature of the women's disclosures and the significant attention they received.  The bar to survive an anti-SLAPP motion is low, and we think Dickinson has met it here.

We are not persuaded by Cosby's contention that Dickinson failed to produce any evidence showing a third party actually understood the allegedly defamatory statements to refer to her.  In support of his argument, Cosby relies on a Ninth Circuit case applying California law, in which the plaintiffs alleged the defendant made defamatory statements referring to their business.  (*SDV/ACCI, Inc. v. AT&T Corp.* (9th Cir. 2008) 522 F.3d 955.)  The Ninth Circuit affirmed summary judgment against the plaintiffs on the basis that they failed to produce evidence showing a third party actually understood the statements to refer to them as individuals.  The court explained that under California law, "[t]o proceed with their suit as individuals, the [plaintiffs] must show not only that the statement could reasonably be understood as referring to them as

_____

[8]     Dickinson represents that only eight women fit the description of persons "who have come forward in the past two weeks with unsubstantiated, fantastical stories about things they say occurred 30, 40, or even 50 years ago . . . ."  The only support she provides for that number, however, is an unsourced statement in one of her trial briefs, which is not evidence.  (See *In re Zeth S.* (2003) 31 Cal.4th 396, 413–414, fn. 11 ["It is axiomatic that the unsworn statements of counsel are not evidence."].)

29

individuals, but also that some third party understood the statement in this way." (*Id.* at p. 959, citing *De Witt v. Wright* (1881) 57 Cal. 576, 578 ["it is essential not only that it should have been written concerning the plaintiff, but also that it was *so understood* by at least some one third person"].)

Cosby contends that Dickinson likewise failed to produce any evidence showing a third party actually understood the allegedly defamatory statements to refer to her. He overlooks, however, that such evidence need not be direct. Indeed, the *SDV/ACCI* court specifically noted it was not "impugn[ing] the common law rule that circumstantial evidence may be used to prove that defamatory material was published to a third party who reasonably understood it to refer to the plaintiffs," and a plaintiff need not present testimony from a third party regarding what that person heard and understood. (*SDV/ACCI, supra*, 522 F.3d at p. 961.) Here, the allegedly defamatory statements referred to Dickinson by reasonable implication, the press releases in which they appeared were widely disseminated, the topic of Cosby's alleged sexual misconduct was of considerable public interest, and Dickinson, who is herself a well-known public figure, had just days earlier accused Cosby of sexual misconduct during a nationally televised interview. For purposes of an anti-SLAPP motion, we think this is sufficient circumstantial evidence to show at least one third party heard the allegedly defamatory statements and actually understood them to refer to Dickinson.

### E. Dickinson Produced Sufficient Evidence Showing the November 20 and 21 Press Releases Contain Actionable Assertions of Fact

Cosby maintains Dickinson cannot prevail on her claims premised on the November 20 and 21 press releases because

30

neither press release contains an actionable assertion of fact. Instead, Cosby argues, they merely express Singer's opinion, for which he adequately disclosed all the facts upon which he relied. We disagree.

### 1. Applicable Law

" 'The sine qua non of recovery for defamation . . . is the existence of falsehood.' [Citation.]  Because the statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability.  Although statements of fact may be actionable as libel, statements of opinion are constitutionally protected.  [Citation.]" (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 (*McGarry*).)  Statements of opinion, however, do not enjoy blanket protection.  (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 384–385 (*Franklin*).)  Rather, "a statement that implies a false assertion of fact, even if couched as an opinion, can be actionable." (*McGarry, supra,* 154 Cal.App.4th at p. 112, relying on *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 18–19 (*Milkovich*).)  The dispositive question is not whether a statement is fact or opinion, but "whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact." (*Franklin, supra*, at p. 385; see *Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 696.)

To make this determination, we apply a totality of the circumstances test.  First, we examine the language of the statement itself, to determine whether the words could be understood in a defamatory sense.  Second, we examine the context in which the statement was made. (*Franklin, supra,* 116 Cal.App.4th at p. 385.)

31

In considering the *language* of the statement, we look at whether the purported opinion discloses the facts on which it is based and does not imply there are other, unstated facts which support the opinion. "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." (*Milkovich, supra,* 497 U.S. at pp. 18–19; see *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456, 1471 ["An opinion is actionable if it discloses all the statements of fact on which the opinion is based and those statements are false"].) We also consider whether the statement was cautiously phrased in terms of the author's impression. (*Baker, supra,* 42 Cal.3d at pp. 260–261.)

In considering the *context* of the statement, we look at the audience to whom the statement was directed (*Baker, supra,* 42 Cal.3d at p. 261), the forum in which the statement was made (see e.g. *Summit Bank v. Rogers, supra,* 206 Cal.App.4th at p. 699) and the author of the statement (see, e.g., *Franklin, supra,* 116 Cal.App.4th at p. 389).

### 2. Application

After considering the totality of the circumstances, we think a reasonable fact finder could conclude the allegedly defamatory statements in the November 20 and 21 press releases imply provably false assertions of fact. The clear implication of both statements, which Cosby does not directly contest, is that all the women who recently accused him of sexual misconduct were lying. Neither statement is phrased cautiously in terms of opinion. They do not include language such as, "I think," or "I believe." Rather, both statements are expressed in unconditional,

32

matter-of fact terms. They express factual assertions regarding the veracity of the accusations, not opinion.

The context in which the statements were made further supports our conclusion that a reasonable listener would understand the statements as assertions of fact, rather than opinion. As we explained in *Dickinson I*, "[t]he rape allegations against Cosby were a subject of national attention and much public speculation. It would perhaps be unactionable opinion if an unrelated individual, with no actual knowledge of the rape, chatting in a public forum, were to say, 'Dickinson lied about the rape; after all, she told a different story in her book.' That may be unactionable opinion because it is based on disclosed facts and the speaker would not be presumed to be basing the opinion on anything else." (*Dickinson I, supra,* 17 Cal.App.5th at p. 689.) However, "[w]hen a man is publicly accused of raping a woman and responds with a public statement claiming the accusation itself is false, it is reasonable that a member of the public hearing the statement would *not* think the denial means, 'I'm neither affirming nor denying that I raped her, but look at all this evidence challenging her credibility.' That the speaker making the denial is himself the accused rapist strongly implies that the denial includes a denial of the rape itself. Here, the speaker was the accused's attorney, speaking with presumed agency. We see no reason the result should be different." (*Id*. at pp. 689–690, fn. 17.)

The same analysis applies equally to the allegedly defamatory statements at issue in this appeal. Indeed, given the circumstances, we think a reasonable listener would understand the November 20 and 21 press releases as Cosby's implicit denials of the accusations, rather than the opinions of his

33

attorney.  At the very least, they're reasonably susceptible to that interpretation, which is sufficient to survive an anti-SLAPP motion.

Even if we were to accept Cosby's premise that a reasonable listener would understand the statements as Singer's opinion, we would nonetheless find them actionable.  Cosby insists the statements are nonactionable because both press releases set forth a sufficient factual basis for any opinions expressed therein.  We can dispense of this argument summarily as it relates to the November 20 press release, which provides no factual basis, whatsoever, for the statement referring to Dickinson.[9]

With respect to the November 21 press release, Cosby asserts it discloses three facts underlying Singer's opinion: (1) the alleged acts occurred many years earlier; (2) it is "illogical that so many people would have said nothing, done nothing, and made no reports to law enforcement or asserted civil claims if they thought they had been assaulted;" and (3) "it makes no sense that not one of these new women who just came forward for the first time now ever asserted a legal claim back at the time they allege they had been sexually assaulted."

There are three reasons why Singer's disclosure is insufficient.  First, because Singer represented himself as Cosby's attorney, a listener might reasonably assume he previously discussed the allegations and responses with Cosby, who would

---

[9]     Cosby suggests it is sufficient that Singer disclosed in the press release the factual basis for his statement implying Traitz lied about Cosby.  Whether Traitz lied, however, has no bearing on whether Dickinson did so.  That Singer may have disclosed the factual basis for his opinion of Traitz, therefore, is irrelevant.

know for certain whether they were true. Therefore, there is a strong implication that Singer's opinion is based on an undisclosed and provably false fact: Cosby did not rape Dickinson.

Second, the press release does not disclose all the facts on which Singer purportedly based his opinion. Singer's declaration admits that he reached his opinion about Dickinson based on several other facts, including his prior experiences with her, his research into her credibility, and statements she made in her autobiography. None of these facts are contained in the press release, making it impossible for the readers to judge for themselves whether the facts support the opinion.

Third, Dickinson's evidence shows that one of the purported facts—that she "said nothing [and did] nothing"—is itself false. Dickinson stated in her declaration that she previously disclosed to several friends that Cosby raped her and she pressed to have the incident included in her autobiography. An opinion based on a provably false fact is itself potentially actionable.[10]

---

[10] We are aware that a federal court found, in connection with a lawsuit brought by another plaintiff, that the November 21 press release adequately disclosed the factual basis for Singer's opinion. (See *Hill v. Cosby* (3d Cir. 2016) 665 Fed.Appx. 169, 175–176.) We are not bound by the intermediate federal court's decision. (*People v. Williams* (1997) 16 Cal.4th 153, 190.) Nor are we persuaded by it. As we discussed at length in *Dickinson I*, the federal court opinion does "not give sufficient weight to the fact that Singer was making the statements as Cosby's agent." (*Dickinson I, supra*, 17 Cal.App.5th at pp. 689–690, fn. 17.) Nor does it explicitly address whether the press release implied undisclosed facts, whether it disclosed all the facts upon which the opinion was based, or whether the stated facts were true.

35

We reject Cosby's contention that the statements are not actionable because they represent zealous advocacy by his attorney, who had an ethical duty to voice a defense of his client. Cosby contends that in a "free and open society, our justice system should and *does* provide wide latitude for defense attorneys to make such statements." However, as discussed above, there is evidence that Cosby personally approved or authorized the statements before Singer issued them. Cosby had no ethical obligation to issue press releases containing known falsehoods, nor does it benefit our free and open society for him to do so.

## DISPOSITION

The order is affirmed. Dickinson is awarded her costs on appeal.

**CERTIFIED FOR PUBLICATION**

BIGELOW, P. J.

WE CONCUR:

GRIMES, J.

STRATTON, J.

36