Filed 7/12/21  Asher v. Society of Children's Book etc. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| JAY ASHER,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>SOCIETY OF CHILDREN'S BOOK WRITERS AND ILLUSTRATORS et al.,<br><br>    Defendants and Respondents. | B299303<br><br>(Los Angeles County Super. Ct. No. 19STCV01907) |

APPEAL from an order of the Superior Court of Los Angeles County, David Sotelo, Judge.  Affirmed.

Fisher Law Office and Patrick L. Fisher for Plaintiff and Appellant.

Kaufman Borgeest and Ryan and Jeffrey S. Whittington for Defendants and Respondents.

———————————

# INTRODUCTION

Jay Asher asks us to reverse the trial court's order granting a special motion to strike his complaint as a strategic lawsuit against public participation under the anti-SLAPP statute, Code of Civil Procedure section 425.16.  We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual Background*

Appellant Jay Asher (Asher) writes for teenagers, with four published books, including *Thirteen Reasons Why*, a New York Times best-selling novel for young adults.[1]

Respondent Society of Children's Book Writers and Illustrators (SCBWI) is a non-profit network and forum for individuals who write and illustrate books for children and young adults.  SCBWI has more than 22,000 members worldwide, with over 80 regional chapters.  Asher was an active member of SCBWI from 1999 until 2018, during which time he attended numerous SCBWI conferences and served as faculty at various SCBWI events.

Respondent Lin Oliver (Oliver) is a co-founder and the executive director of SCBWI.  Oliver was authorized to make decisions and issue statements on behalf of SCBWI, discipline members of SCBWI, and terminate an individual's membership in SCBWI.  She also managed staff and personnel matters related to SCBWI.

---

[1]    In 2017, Netflix launched a televised series based on *Thirteen Reasons Why*.

B.    *Civil Complaint*

On January 18, 2019, Asher filed a complaint for defamation per se, defamation per quod, and intentional infliction of emotional distress against SCBWI and Oliver.  He alleged the following in his complaint.

In April 2017, "an individual upset over [Asher's] success" sent an anonymous email to SCBWI and Oliver (collectively, respondents), purportedly from seven female members of SCBWI.  According to the email, Asher used SCBWI to prey upon female members of SCBWI, luring them sexually, then intimidating them into silence by threatening and making the seven female members feel unsafe to attend SCBWI events.

Between April 2017 and December 2017, Oliver "discussed the accusations" written in the anonymous April 2017 email with Asher.  Asher stated the allegations in the email were "false."  Asher disclosed to Oliver and SCBWI that while he did develop relationships with SCBWI members, "none of the relationships were initiated, maintained, or ended as described" in the anonymous email.  Oliver told him the email read like "sour grapes."  They discussed Asher temporarily taking a step back from his active role in SCBWI.  Since then, "no further investigation into the April 2017 accusations against [Asher] was conducted."

In June 2017, SCBWI and Oliver received an email from a woman who identified herself by name and stated she was one of the seven anonymous women who authored the April 2017 emails.  She "stated that the accusations in the April 2017 emails were false."

3

In December 2017, SCBWI and Oliver received an email from another one of the seven anonymous women who said Asher "used threats and intimidation to keep her quiet." Asher alleged these allegations were false.

On February 12, 2018, Oliver delivered the following statement to the Associated Press: " 'Both Jay Asher and David Diaz were found to have violated the SCBWI code of conduct in regard to harassment' . . . . 'Claims against them were investigated and, as a result, they are no longer members and neither will be appearing at any SCBWI events in the future.' "

On February 14, 2018, SCBWI issued a statement to Publishers Weekly: " 'It is of paramount importance to SCBWI that we maintain a welcoming and safe environment for all members of our community.' " The SCBWI " 'would like to take this opportunity to express deep regret that any harassment occurred within the SCBWI community. We hope that our newly crafted and detailed anti-harassment policies and procedures will ensure that SCBWI is a safe space for everyone. We care about our members, and put their emotional and physical safety and comfort as our highest priority.' "

The February 12 and February 14, 2018 statements were printed and distributed online to virtually every major news outlet in the United States. Both statements were attached as exhibits to the complaint.

Asher denied all allegations of wrongdoing and provided SCBWI and Oliver "proof that the author of the December 29, 2017 email sexually coerced him at a SCBWI Conference and had been harassing [him] for over a decade." SCBWI and Oliver "consciously disregarded this offer and did not perform any

4

investigation into whether the allegations made in the email were true."

Asher argued both statements to Associated Press and Publishers Weekly were defamatory. He argued the statements were false as he "did not violate the SCBWI code of conduct in regard to harassment," claims against Asher were "not 'investigated' as this term is commonly used and understood," and he was not removed from SCBWI as a result of any violation of the SCBWI code of conduct in regard to harassment. He argued the statement injured Asher "in his profession as an author of novels for teenagers by painting him as a criminal guilty of harassment." He suffered severe humiliation, emotional distress, physical and mental pain, and anguish. He "lost sleep due to the inordinate amount of stress [he] has been experiencing." He requested the court award him general damages, special damages, exemplary and punitive damages, attorney fees and costs.

C. *Special Motion to Strike Asher's Complaint*

On April 2, 2019, respondents filed a special motion to strike Asher's complaint as a strategic lawsuit against public participation under the anti-SLAPP statute, citing Code of Civil Procedure[2] section 425.16, subdivision (e)(3).

---

[2] Further undesignated statutory references are to the Code of Civil Procedure.

According to respondents, Asher's lawsuit "is an ill-conceived and, ultimately, desperate attempt to blame others—and specifically, . . . SCBWI and Lin Oliver—for the impact of the incredibly poor decisions he has made in his personal life." While Asher had "a carefully crafted public persona of treating women with respect and supporting the burgeoning #MeToo movement," "[i]n reality, and by [Asher's] own admission, he was engaged in serial extra-marital affairs taking place at SCBWI events." On April 18, 2017, SCBWI and Oliver received an email from a group of seven anonymous female SCBWI members who described Asher as "using the SCBWI conferences, and his platform as an accomplished author, 'to lure women into friendships and then affairs,' and that 'he has left [them] with emotional distress and trauma.'" Several of the seven women had confronted Asher about his behavior, but he harassed and intimidated them into silence, retaliating against them once their relationships/affairs ended. As a result of Asher's threats, the seven women said they no longer felt safe attending SCBWI events. They explained they sent the email anonymously because they feared for their safety and further retaliation from Asher.[3]

---

[3] The April 18, 2017 email further stated: "[H]e has left all of us with emotional distress and trauma, which is especially troubling considering his platform is one built on mental health and treating people with kindness. . . . The affairs he had with us turned serious and many women were told he planned to leave his wife for them. This was never the case and after a while, he moved on to other women in the organization. Several of us confronted him on his behavior and were threatened and intimidated into silence. [¶] While we do realize that we played a role in our relationships with him and that we are responsible as well, the affairs have caused much emotional turmoil and

6

Upon receiving the email and learning of these serious allegations, Oliver "investigated their complaints." She reached out to Asher and his agent, Laura Rennert (Rennert), and spoke with them. Asher confirmed to Oliver he had "engaged in multiple extra-marital affairs with several women at various SCBWI conferences." Oliver explained to Asher that he could no longer be on the SCBWI faculty. He agreed "to decline any invitation that he received from SCBWI." Based on these discussions, Oliver responded to the seven complaining women's first email on April 20, 2017 and stated: "SCBWI has an anti-harassment policy and we take the allegations you have made very seriously." Oliver informed them that Asher will not be invited to be a guest speaker at any SCBWI events for the indefinite future. Rennert then emailed Oliver and commended her for Oliver's response, stating, "Thank you again for being so calm and reasonable in the face of the situation, and for being willing to get on the phone to think it through and talk about the best possible response. We are sorry you got pulled into this situation, and appreciate your clear-headed, reasonable approach. [¶] I think this letter back is perfect."

The seven women, however, disagreed and found the proposed resolution was insufficient based on Asher's conduct.

---

distress in our lives. We have had divorces, it has impacted our careers, and it has limited our ability to attend SCBWI events or other . . . events where he may be present." Asher "continues to regularly destroy the mental health of many women, and he has taken advantage of women who are themselves depressed. In addition to the 7 of us, there are 5 other women who have also been involved with him but we did not feel comfortable approaching them about this letter."

They wanted Asher banned from SCBWI events. They expressed via email they would "all like to renew [their] memberships and feel safe returning to an SCBWI conference, but if Mr. Asher is allowed on the premises, that will not be possible." The women provided an example of "how he abused his influence with SCBWI" when he claimed one of the women he had an affair with was "a stalker and that he hardly knew her," proceeding to "ruin[] this woman's reputation." Oliver discussed the seven anonymous women's response with Asher and Rennert, and explained that SCBWI needed to respect their wishes. Asher was then banned from attending SCBWI events.

On December 29, 2017, eight months after SCBWI received the anonymous April email, Robin Mellom (Mellom) sent another email to SCBWI and Oliver, revealing that she was one of the seven anonymous women. She had an affair with Asher from 2005 until 2008. She explained that even though Asher was currently not attending SCBWI events, he was spreading rumors about her, calling her crazy and using threats and intimidation to keep her quiet. Asher had told others "SCBWI women are pursuing him because of his fame . . . that these women are preying on him and he is a victim." He was also telling others that Mellom alone had drafted the April 18, 2017 email and had "made up the whole thing."

On January 4, 2018, a story broke in the School Library Journal (SLJ) revealing troubling reports of misconduct in the children's publishing industry. On February 7, 2018, a similar story broke on the website, Medium. When the allegations became public through independent third parties, SCBWI and Oliver faced backlash for "apparently failing to recognize the problem and failing to reprimand" Asher. Multiple commenters

on the articles "expressed their anger and disappointment in SCBWI and [Oliver] regarding the conduct of Mr. Asher and SCBWI's response."[4]

Respondents alleged in their motion: "Given the bombshell nature of the SLJ and Medium articles in the publishing industry, and the explosion of accusatory and speculative comments to those articles, SCBWI and [Oliver] determined that a release to the press was necessary to set the record straight" and to explain to members that SCBWI was working diligently to address this issue and assure their conferences would be a safe and welcoming space for everyone. They thus "necessarily and

---

[4] Some comments include:

"I, too, experienced predatory behavior from Jay Asher. He uses SCBWI to find young, new writers. When I discovered his true nature, I cut off all communication and tried to warn other women through the whisper network. He found out and used threats and intimidation to quiet me. Well, Mr. Asher, the intimidation stops NOW. We will no longer whisper."

"I can't help but remember Jay Asher as one of Lin Oliver's darlings. I'm so deeply sorry to the women impacted by this. The culture of misogyny and abuse doesn't belong anywhere, but most especially not in kidlit."

"Thank you to the women who named their harassers. SCBWI conferences are places where harassment can readily flourish, given the power differential between people with standing in the industry and those looking to enter it. . . . I hope SCBWI comes up with a better reporting mechanism, as well as a zero-tolerance policy."

"Time for SCBWI to decide which side they are on."

appropriately issued statements to the press" to "assure SCBWI members that SCBWI takes such allegations of harassment seriously and would work diligently to provide members a safe and welcoming space." Respondents then issued the February 12 and February 14, 2018 statements to the Associated Press and Publishers Weekly, as described above.

SCBWI's harassment policy at the time addressed behavior such as "offensive verbal comments relating to gender, gender identity and expression, sexual orientation, disability, physical appearance, body size, race, religion, deliberate intimidation, stalking, following, harassing photography or recording, sustained disruption of talks or other events, inappropriate physical contact, and unwelcome sexual attention." Furthermore, SCBWI's code of conduct states, in relevant part: "We do not tolerate harassment of conference participants in any form. Harassment includes . . . deliberate intimidation, stalking, following . . . and unwelcome sexual attention." SCBWI reserved the right to require anyone not complying with its code of conduct to be barred from future SCBWI events.

Respondents contended Asher filed his complaint "to retaliate" against them for "making statements to the press confirming that allegations of harassment had been made against [him] and for expelling [him] from SCBWI." They argued Asher's complaint is barred by section 425.16 because it arises from SCBWI's and Oliver's acts in furtherance of their first amendment rights of petition and free speech, which is protected activity. They further contended Asher cannot establish a probability of prevailing on his complaint.

In support of the special motion to strike the complaint, SCBWI and Oliver included a declaration by Oliver, a copy of the

10

email communications with the seven anonymous female SCBWI members, a copy of Oliver's email communications with Rennert and Mellom, the statement to Associated Press (AP), and the statement to Publishers Weekly (PW).

D.    *Asher's Opposition to the Special Motion to Strike*

On April 10, 2019, Asher filed his opposition to the special motion to strike, and argued his lawsuit was "not intended to punish [SCBWI and Oliver] for public participation" but was "intended to vindicate Mr. Asher for the wrongs perpetrated against him by" SCBWI and Oliver.  Since Oliver's "false statements", Asher "lost all speaking engagements . . . , lost a Consulting Producer credit on the Netflix show based on [his] novel, had two offers to pursue a TV show based on [his] second novel pulled, had an offer to develop a screenplay into a TV movie dropped, was let go by [his] literary agent, was let go by [his] film agent, and was asked not to attend another writing conference." He attributed these losses to Oliver's and SCWBI's untruthful comments about him.

He argued the first anonymous email was sent by only two individuals—Mellom and Sandi Van Lieu (Van Lieu).  According to Asher, Mellom "provided [him] with numerous alcoholic drinks" because "she knew [he] was not used to drinking alcohol" and "coerced [Asher] into a sexual relationship by providing  . . . alcoholic drinks."

Van Lieu and Asher met at an SCBWI event in 2009 and started a consensual sexual relationship in 2012.  Van Lieu learned from Mellom in 2015 that she was also romantically involved with Asher.  According to Van Lieu, Mellom "pressured and manipulated [Van Lieu] into thinking negatively about Mr. Asher" and "talked [her] into doing something to prevent Mr.

11

Asher from continuing to have romantic relationships with women who attended the conferences." Van Lieu drafted an anonymous email to SCBWI and sent the draft to Mellom. Van Lieu believes Mellom rewrote the entire draft before it was sent off.

On May 30, 2017, Asher and Van Lieu discussed the anonymous email. Van Lieu disclosed to Asher that while she co-authored the email and was one of the complaining women, the email was untruthful in many ways. Van Lieu has "never witnessed Mr. Asher harass women, threaten women into silence, traumatize women."

Asher explained to Oliver that he had "consensual, power symmetric, extramarital affairs, but denied all allegations of harassment." He alleged Oliver agreed with him that "there was no reason to believe the truthfulness of the allegations in the anonymous email" and called the allegations "sour grapes."

Asher's agent Rennert "never witnessed Mr. Asher harass women, threaten women into silence, traumatize women," etc., during her time as Asher's literary agent from 2006 until 2018.

Asher argued that SCBWI's and Oliver's special motion to strike should be denied because they cannot show Asher's complaint arises from protected activity and because Asher can establish a probability of prevailing on the merits.

Asher's opposition included declarations by Asher, Van Lieu, and Rennert.

E.    *Trial Court's Ruling*

On April 26, 2019, the trial court granted respondents' special motion to strike Asher's complaint. As to the first prong, the court found SCBWI and Oliver had met their burden to show the AP and PW statements come within the protection of the

12

anti-SLAPP statute. The anti-harassment statements were made to news media PW and AP—both of which are public forums—and were connected to an issue of great public interest during the time of the #MeToo movement in the United States. As to the second prong, the court found Asher had not demonstrated a probability of success on the merits of his three causes of action. The trial court also found the declarations of Lieu and Rennert to be "of very little evidentiary value, almost not relevant, but they were thrown in, in any event."

On May 28, 2019, the trial court entered judgment in favor of respondents.

Asher timely appealed.

## DISCUSSION

### A. *Standard of Review*

We review a trial court's ruling on a special motion to strike pursuant to section 425.16 under the de novo standard. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788; *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).) "In other words, we employ the same two-pronged procedure as the trial court in determining whether the anti-SLAPP motion was properly granted." (*Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1652.)

As always, "our job is to review the trial court's ruling, not its reasoning." (*People v. Financial Casualty & Surety, Inc.* (2017) 10 Cal.App.5th 369, 386.) We consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) In considering the pleadings and declarations, we do not make

13

credibility determinations or compare the weight of the evidence; instead, we accept the opposing party's evidence as true and evaluate the moving party's evidence only to determine if it has defeated the opposing party's evidence as a matter of law. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3 (*Soukup*).)

B.      *Applicable Law*

Section 425.16 provides "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)  An " 'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue' " is defined in section 425.16 to include, in relevant part:  "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law," and "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (*Id*., subd. (e).)

The Legislature enacted section 425.16 to prevent and deter "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances."  (§ 425.16, subd. (a).)  The purpose of the anti-SLAPP law is "not [to] insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage,

*meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).)

When a party moves to strike a cause of action (or portion thereof) under the anti-SLAPP law, a trial court evaluates the special motion to strike by implementing a two-prong test: (1) has the moving party "made a threshold showing that the challenged cause of action arises from protected activity" (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056); and, if it has, (2) has the non-moving party demonstrated that the challenged cause of action has " 'minimal merit' " by making "a prima facie factual showing sufficient to sustain" a judgment in its favor? (*Baral*, *supra*, 1 Cal.5th at pp. 384–385; *Navellier v. Sletten* (2002) 29 Cal.4th 82, 93–94; see also § 425.16, subd. (b)(1)).  If the first prong is satisfied by the moving party, "the burden [then] shifts to the [non-moving party] to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral*, at p. 396.)

C.    *Prong 1*: *Arising from Protected Activity*

Respondents shoulder the initial burden to show that Asher's complaint is based on protected activity, that is, their alleged acts were taken in furtherance of a right of petition or free speech.  (See *Park*, *supra*, 2 Cal.5th at p. 1061; see *Birkner v. Lam* (2007) 156 Cal.App.4th 275, 281.)  Section 425.16, subdivision (a) itself provides that it "shall be construed broadly." The wording of the statute protects the right of litigants to the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions.  (*Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467, 1479.)

15

Nowhere in Asher's briefing on appeal does he dispute that respondents have met their initial burden of establishing that his complaint is based on protected activity. His briefing addresses only step two of the anti-SLAPP analysis. " ' "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' " (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956; see also *Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685 ["Courts will ordinarily treat the appellant's failure to raise an issue in his or her opening brief as a waiver of that challenge."]) We conclude Asher has conceded this issue.

D.    *Prong 2*: *Probability of Prevailing on the Claims*

The burden now shifts to Asher to show a probability of prevailing on his three causes of action for defamation per se, defamation per quod, and intentional infliction of emotional distress. We conduct an inquiry into whether Asher has stated "legally sufficient" claims and made a "prima facie factual showing" with competent, admissible evidence sufficient to sustain a favorable judgment on each of the challenged causes of actions. (*Baral*, *supra*, 1 Cal.5th at pp. 384–385; *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) The moving party "may not rely solely on its complaint . . . instead, its proof must be made upon competent admissible evidence." (*San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th 76, 95.)

We reiterate that we do not make credibility determinations or compare the weight of the evidence; instead, we accept the opposing party's evidence as true and evaluate the moving party's evidence only to determine if it has defeated the

16

opposing party's evidence as a matter of law. (*Soukup, supra,* 39 Cal.4th at p. 269, fn. 3.)

1.    <u>Defamation Claims</u>

Asher asserted causes of action for defamation per se and defamation per quod as to the February statements to the AP and PW.

The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage. (*Hoang v. Tran* (2021) 60 Cal.App.5th 513, 531–532.) Defamation can be of two types, libel (publication by writing) or slander (publication orally uttered). (Civ. Code, §§ 45–46). A published statement is defamatory if it "exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.)

Statements that are defamatory on their face (by implication from the language used by the speaker) and without the need for extrinsic explanatory matter are considered defamatory per se. (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112; *MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 548–550 (*MacLeod*).) However, if the reader would be able to recognize a defamatory meaning of the statement " 'only by virtue of his or her knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons,' " then it is defamation per quod, not defamation per se. (*Bartholomew v. YouTube, LLC* (2017) 17 Cal.App.5th 1217, 1226–1227.) Where the statements are defamatory on their face, damages are presumed and a plaintiff

17

(here, Asher) is not required to plead or prove actual damages. (*MacLeod*, at pp. 549–550.) Where the statement is deemed defamatory per quod, plaintiff must also prove special damages. (*Id.* at p. 550.)

A threshold determination in a defamation action is whether the plaintiff is a public figure. This is understandably uncontested as Asher is a well-known author famous for young adult novels like *Thirteen Reasons Why*, later made into a popular Netflix series.

Public figures have the "burden of proving both that the challenged statement is false, and that [Respondents SCBWI and Oliver] acted with ' "actual malice." ' " (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 81 (*Christian Research*).) In this context, respondents acted with actual malice if they "publish[ed] a knowingly false statement or where [they] 'entertained serious doubts as to [its] truth.' " (*Ibid.*) For instance, "reliance upon sources known to be unreliable [citations] or known to be biased against the plaintiff" and "failure to investigate" may, "in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." (*Reader's Digest Assn.* (1984) 37 Cal.3d 244, 258.) A public figure plaintiff must prove actual malice by clear and convincing evidence, meaning, the evidence must be so clear as to leave no substantial doubt and must be sufficiently strong to command the unhesitating assent of every reasonable mind. (*Christian Research*, at pp. 81, 84.)

a. The AP Statement

Oliver/SCBWI issued the following statement to AP on February 12, 2018: "Both Jay Asher and David Diaz were found to have violated the SCBWI code of conduct in regard to

18

harassment.  Claims against them were investigated and, as a result, they are no longer members and neither will be appearing at any SCBWI events in the future."  Asher argues the AP statement was defamation per se and defamation per quod, and he contends he has established a probability of prevailing on the merits of said claims.

There is no doubt the AP statement is a publication, as it was a written statement to the Associated Press.

As for falsity, Asher alleged the AP statement is false because "the average reader of the AP statement . . . could reasonably have the impression that Asher was guilty of harassment based upon an investigation conducted by SCBWI" *but that no such investigation or "systematic inquiry" was actually conducted by Oliver/SCBWI.*  We conclude Asher has not produced admissible evidence to support the allegation.  Asher's complaint itself alleges Oliver "discussed the accusations written in the anonymous April 2017 emails" with Asher, that Asher disclosed he developed relationships with SCBWI members, but that "*no further investigation* into the April 2017 accusations against [Asher] *was conducted.*"  (Italics added.)  By those words themselves, Asher alleged that at least some investigation had been conducted.  In addition, Asher's declaration discusses multiple telephone conversations he had with Oliver about the allegations of harassment.  He and his agent initially agreed to the ban on further participation in SCBWI events.

Yet Asher minimizes the conversations:  he states Oliver never discussed with him the allegations in Mellom's email to Oliver or the comments to the SLJ and Medium online articles.  He also states:  "*To my knowledge*, neither Ms. Oliver, nor SCBWI have ever reached out to any of my accusers to

19

investigate the veracity of the claims made against me." Italics added.) This statement does not tell us much other than that Asher himself does not know relevant facts. As the seven women who accused him of harassment in the April 2017 email were *anonymous*, how would Asher have confirmed with the "accusers" whether Oliver contacted them during any investigation she conducted. Asher states in that same declaration that he had no contact with Oliver from April 2017 until February 2018, so how would he have discovered or learned from Oliver whether she had or was in the process of investigating the allegations made. We are not persuaded. Asher has produced no admissible evidence that the AP statement is false with respect to whether an investigation was conducted.

Asher next argues the AP statement "painted [him] as a criminal found guilty of harassment." However, we draw no such conclusion from the AP statement which says Asher violated the SCBWI's code of conduct regard to harassment. It does not state he is a "criminal found guilty of harassment." A reader would not reasonably equate a finding of harassment by SCBWI under its code of conduct to a court judgment finding Asher guilty of an actual crime. Thus, Asher's defamation claims fails in this regard as well.

Asher offers several miscellaneous arguments, but none convince us to reach a different conclusion. For instance, Asher argues the only evidence respondents offered to prove Asher committed acts of harassment are "hearsay statements," namely, the anonymous emails and anonymous comments on the internet. He argues respondents did not offer sworn declarations reflecting firsthand knowledge of Asher's alleged misconduct. Asher's argument misses the point, as respondents' only burden was to

20

show that Asher's complaint targeted protected activity at step one of the two-step analysis for section 425.16. This they did.

Asher also argues the trial court erred by weighing respondents' evidence against Asher's evidence and indulging in inferences unfavorable to him. This argument is irrelevant as this court reviews the issues de novo, conducting an independent analysis of Asher's claims.

### b. The PW Statement

Respondents issued the following statement to PW on February 14, 2018: " 'It is of paramount importance to SCBWI that we maintain a welcoming and safe environment for all members of our community.' " " 'We would like to take this opportunity to express deep regret that any harassment occurred within the SCBWI community. We hope that our newly crafted and detailed anti-harassment policies and procedures will ensure that SCBWI is a safe space for everyone. We care about our members, and put their emotional and physical safety and comfort as our highest priority.' " Asher argues the PW statement constitutes defamation per se and defamation per quod, and that he has shown a probability of prevailing on the merits.

This statement to PW constitutes a written publication.

However, we again find Asher cannot demonstrate that respondents' statement to PW was false. This press release generally sets out SCBWI's priorities and announces the creation of new sexual harassment policies. Asher presented no evidence the information in the press release was false.

21

Asher argues the PW statement is defamatory because the language indicates that *due to Asher's alleged conduct*, SCBWI "was unable to maintain a welcoming and safe environment for its members"; "SCBWI members were harassed"; "SCBWI was forced to newly craft detailed anti-harassment policies and procedures that would ensure SCBWI was a safe space for everyone."

We disagree. The PW statement does not mention Asher or any other person. It carefully focuses on redress in the industry as a whole. There is nothing defamatory to Asher on the face of the PW statement. Asher has not shown a probability of prevailing on his defamation per se cause of action as to the PW statement. As well, he has produced no admissible evidence to demonstrate that the PW statement proximately caused any of the harm he alleged as to the defamation per quod cause of action. Asher has not carried his burden with respect to the PW statement.

2.     Intentional Infliction of Emotional Distress Claim

To establish a cause of action for intentional infliction of emotional distress (IIED), Asher must show: 1) extreme and outrageous conduct by respondents with the intention of causing, or reckless disregard of the probability of causing, emotional distress; 2) suffering severe or extreme emotional distress; and 3) actual and proximate causation of the emotional distress by the respondents' outrageous conduct. (*Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 486.) Conduct is considered outrageous when it is "so extreme as to exceed all bounds of that usually tolerated in a civilized community." (*Ibid.*)

However, we do not analyze Asher's probability of prevailing on his IIED claim, as "the collapse of [Asher's] defamation claim[s] spells the demise of all other causes of action" in his complaint. (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 34.) As our Supreme Court observed, " ' "to allow an independent cause of action for the intentional infliction of emotional distress, based on the same acts which would not support a defamation action, would allow plaintiffs to do indirectly what they could not do directly. It would also render meaningless any defense of truth or privilege." ' " (*Ibid*.) Here, Asher's claim for IIED is based upon the same underlying acts and protected activity as his defamation claims. We have determined Asher cannot demonstrate a probability of prevailing in his defamation causes of action. It follows that he cannot show a probability of prevailing on his IIED claim.

As a final note, respondents argue they are entitled to recover attorney fees should they prevail on appeal. (See *Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1446.) This issue is properly determined upon appropriate motion to the trial court.

## DISPOSITION

The order granting respondents' special motion to strike the complaint is affirmed. Respondents are awarded costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

GRIMES, Acting P. J.

WILEY, J.

24