Filed 2/18/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| BOB GRENIER et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> TIM TAYLOR et al., <br><br> Defendants and Appellants. | F067263 <br><br> (Super. Ct. No. VCU249252) <br><br><br> **OPINION** |

APPEAL from an order of the Superior Court of Tulare County.  Paul A. Vortmann, Judge.

McCormick, Barstow, Sheppard, Wayte & Carruth, Todd W. Baxter and Scott M. Reddie for Plaintiffs and Appellants Bob Grenier and Gayle Grenier.

California Anti-Slapp Project, Mark Goldowitz and Paul Clifford for Defendants and Appellants Tim Taylor and Alex Grenier.

Defendants and appellants, Tim Taylor and Alex Grenier, challenge the trial court's denial of their motion to strike the complaint for defamation and intentional infliction of emotional distress filed by plaintiffs and appellants, Bob Grenier and Gayle Grenier, as a strategic lawsuit against public participation (SLAPP) under Code of Civil

Procedure[1] section 425.16.  The trial court concluded that the alleged defamatory statements concerned an issue of public interest and therefore were entitled to protection under section 425.16.  The court further found that Bob[2] was a limited purpose public figure.  Bob and Gayle challenge both of these findings.  However, the court also determined that Bob and Gayle had met their burden of demonstrating a probability of prevailing on their claims.

The trial court correctly concluded that the alleged defamatory statements concerned an issue of public interest.  However, contrary to the trial court's finding, Bob is not a limited purpose public figure.  Further, Bob and Gayle demonstrated a probability of prevailing on their claims.  Accordingly, the trial court's order denying the motion to strike will be affirmed.

## BACKGROUND

Bob is the pastor of the Calvary Chapel Church, a non-denominational church located in Visalia (Church).  Bob has held this position for approximately 35 years.  In 2006, the Church membership included approximately 800 adults and 200 children.  As of January 2013, Church membership had dropped to approximately 400 adults and 150 children.

In connection with his role as a pastor, Bob has undertaken various endeavors.  He wrote a book, "A Common Miracle," which "details Pastor Bob's conversion to Christ, and his being called to ministry as a Pastor-Teacher."  Bob also runs the Pastor Bob Grenier website to help teach the Bible.  Although Bob claims to have only sold a couple hundred copies of "A Common Miracle," this book can be downloaded for free on his website.

---

[1]    All further statutory references are to the Code of Civil Procedure.

[2]    We use the parties' first names for convenience only.  No disrespect is intended.

2.

Bob hosts a radio show called "Grace for Today," on which he teaches "the Word of God in a simple and easy to understand and applicable way." In addition to California, this program is broadcast on stations in Texas, Missouri, Virginia, Tennessee and Hawaii.

On the "Grace for Today" website, Bob offers "Daily online Devotionals," counseling and access to his recent sermons. Some of Bob's sermons are posted to YouTube and his teachings are available on iTunes and Twitter.

Bob also volunteers as a police chaplain for the Visalia Police Department.

Bob has been married to Gayle since 1977. Bob and Gayle have four children, Alex Grenier, Geoffrey Grenier, Paul Grenier and Robert Grenier. Alex and Geoffrey are Bob's stepchildren who Bob raised from the time Alex was three years old and Geoffrey was two years old.

In 2004 and 2005, after Alex had left Bob and Gayle's home, Alex confronted Bob and Gayle and demanded an apology. Alex accused Bob of emotionally and physically abusing him and his brothers. Bob and Gayle refused to admit that Bob had committed such abuse.

Tim began attending the Church in 2005. Based on what he observed and information provided by other Church members, Tim began a discussion about Bob on an internet forum.

Alex saw Tim's discussion in 2009 and added his own comments. In 2010, Alex created his own website/blog where he writes about his experiences with Bob, the Church and the Calvary Chapel organization. Tim has added comments in response to Alex's posts.

Alex and Tim's internet comments were not flattering to Bob. Rather, Alex and Tim described Bob as abusive and of bad character.

In response to these internet posts, Bob and Gayle filed the underlying action for defamation and intentional infliction of emotional distress against Alex and Tim. Bob and Gayle allege that Alex has conducted a "cyber-bully hate campaign." They claim

3.

that both Alex and Tim have repeatedly stated that "Bob is a 'child molester' and a 'corrupt pastor who was stealing money from the church'" and that these allegations are false.

As part of their complaint, Bob and Gayle set forth examples of statements posted by Alex about Bob on various internet forums. These examples include:

"normal human beings don't tolerate … molestation and corruption by a Pastor/Chaplain but kool aid drinkers sure do."

"Bob Grenier is a pastor and police chaplain in a Position of Trust in our society, lots of folks have trusted him and been hurt badly. Bob shouldn't be trusted. I warn people to steer clear of his church and his spiritual leadership."

"He's a bad guy and has gotten away with a lot of bad stuff in his life including drug dealing, drug smuggling, child abuse, alleged molestation (paul says bob molested him), stealing money from the church, spiritual abuse and much other stuff."

"Facts are Bob's son Paul alleges Bob Grenier molested him and Calvary Chapel and their articulated CCOF and now CC Association has failed to investigate the allegations fully and are ignoring the potential that other kids could get hurt."

"The terrible fact is, kids have been introduced to pedophiles/child molesters in the Calvary Chapel System. Kids have been molested through those relationships (due to trusting the Brand and the person representing the Brand). The parents should not have trusted Calvary Chapel in these instances."

"The other terrible fact is, Calvary Chapel Pastor Chris Olague was recently arrested for molesting an 8-year-old girl in Huntington Beach, California, Calvary Chapel Pastor Dino Cardelli is currently serving time for molesting his foster daughter and physically abusing another child in his care, Pastor John Flores of Calvary Chapel Costa Mesa was arrested for raping a teenage girl on the CCCM Campus (and insiders allege CCCM's leadership initially tried to handle the issue in-house until the family got Gloria Allred's office involved) and Calvary Chapel Pastor Bob Grenier is accused by his blood son Paul Grenier of molesting him when he was young."

4.

"Bob Grenier pastor of Calvary Chapel Visalia's child abuse (confirmed in testimony by 24 year CCV Board member Glen C.) and allegations by Paul Grenier of molestation are well documented on this site."

"How about when you stole hundreds of dollars of petty cash from Calvary Chapel Visalia and bought personal items."

"Do the Ends justify the Means? Dunno. I do know that Bob Grenier, of Calvary Chapel Visalia, is a Liar and self-confessed Felony Child Abuser and that Paul Grenier accuses Bob Grenier, the Liar, of Molesting him. I also know that Bob Grenier of Calvary Chapel Visalia is a lying, unrepentant scoundrel who hurts many people …"

Bob and Gayle also included examples of internet posts by Tim. These statements include:

"I'm glad that we have tarnished BG's name enough that they didn't offer him a regional leadership position again."

"Bob Grenier molested his own son."

"Bob Grenier is an evil man. Lord please take him down."

"It is very sad that tax evasion is what might actually take this bad guy down and not his own church out of following sound biblical truths, for the crimes against his sons, staff and congregation."

"A vile disgusting monster. You have no honor Bob Grenier! You sick child molesting evil man!"

Alex and Tim filed a motion to strike the complaint as a SLAPP under section 425.16.

The trial court ruled that the statements at issue concerned a matter of public interest and thus were entitled to protection under section 425.16, subdivision (e)(3). The trial court further concluded that Bob was a "limited purpose public figure" and thus, to prevail on their defamation claims, Bob and Gayle had to prove that Alex and Tim acted with malice. The court then determined that Bob and Gayle had met their burden of demonstrating a probability of prevailing on their claim. Accordingly, the trial court denied the motion to strike.

Both sides have appealed.  Alex and Tim contend the trial court erred in ruling that Bob and Gayle demonstrated a probability of prevailing on their claim.  Bob and Gayle argue the trial court erred in finding that the alleged defamatory statements were entitled to protection and that Bob is a limited purpose public figure.

## DISCUSSION

### 1.  *The anti-SLAPP statute.*

Section 425.16 was enacted in 1992 to provide a procedure for expeditiously resolving "nonmeritorious litigation meant to chill the valid exercise of the constitutional rights of freedom of speech and petition in connection with a public issue.  [Citation.]" (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 235.)  It is California's response to meritless lawsuits brought to harass those who have exercised these rights.  (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 644, disapproved on another ground in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5 (*Equilon Enterprises*).)  This type of suit, referred to under the acronym SLAPP, or strategic lawsuits against public participation, is generally brought to obtain an economic advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff.  (*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 927.)

When served with a SLAPP, the defendant may immediately move to strike the complaint under section 425.16.  To determine whether this motion should be granted, the trial court must engage in a two-step process.  (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76 (*City of Cotati*).)

The court first decides whether the defendant has made a threshold showing that the challenged cause of action is one "'arising from'" protected activity.  (*City of Cotati, supra,* 29 Cal.4th at p. 76.)  The moving defendant must demonstrate that the act or acts of which the plaintiff complains were taken "in furtherance of the [defendant's] right of petition or free speech under the United States Constitution or the California Constitution

in connection with a public issue .…" (§ 425.16, subd. (b)(1); *Equilon Enterprises, supra,* 29 Cal.4th at p. 67.) If the court concludes that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).)

To establish the requisite probability of prevailing, the plaintiff need only have "'"'stated and substantiated a legally sufficient claim.'"'" (*Navellier, supra,* 29 Cal.4th at p. 88.) "'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'"'" (*Id.* at pp. 88-89.) The plaintiff need only establish that his or her claim has minimal merit to avoid being stricken as a SLAPP. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291 (*Soukup*).) Nevertheless, a plaintiff cannot simply rely on his or her pleadings, even if verified. Rather, the plaintiff must adduce competent, admissible evidence. (*Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 614.)

The questions of whether the action is a SLAPP suit and whether the plaintiff has shown a probability of prevailing are reviewed independently on appeal. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999.) Further, the anti-SLAPP statute is to be broadly construed. (§ 425.16, subd. (a).)

**2.      *The trial court correctly determined that the allegedly defamatory statements were entitled to protection under section 425.16.***

Section 425.16, subdivision (e), clarifies what speech constitutes an "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' .…" Such speech includes: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by

law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

The trial court concluded that the alleged defamatory statements were made in a public forum in connection with an issue of public interest and therefore were entitled to protection under section 425.16, subdivision (e)(3). Bob and Gayle argue the trial court erred. According to Bob and Gayle, this is a private family dispute that Alex and Tim have attempted to make public by their own conduct.

The majority of Bob and Gayle's allegations stem from Alex and Tim's internet postings. Statements made on a website are made in a public forum. (*Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1144.) However, not every website post involves an issue of public interest. Mere publication on a website does not turn otherwise private information into a matter of public interest. (*D.C. v. R.R.* (2010) 182 Cal.App.4th 1190, 1226 (*D.C.*).) Thus, the remaining question is whether these statements were made in connection with an issue of public interest.

Section 425.16 does not define "an issue of public interest." Nevertheless, the statute requires the issue to include attributes that make it one of public, rather than merely private, interest. (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132 (*Weinberg*).) A few guiding principles can be gleaned from decisional authorities. For example, "public interest" is not mere curiosity. Further, the matter should be something of concern to a substantial number of people. Accordingly, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. Additionally, there should be a degree of closeness between the challenged statements and the asserted public interest. The assertion of a broad and amorphous public interest that can be connected to the specific dispute is not sufficient. (*Weinberg, supra,* 110

8.

Cal.App.4th at p. 1132.) One cannot focus on society's general interest in the subject matter of the dispute instead of the specific speech or conduct upon which the complaint is based. In evaluating the first step of the anti-SLAPP statute, the focus must be on the *specific nature of the speech* rather than the generalities that might be abstracted from it. (*D.C., supra,* 182 Cal.App.4th at p. 1216.) Finally, a defendant charged with defamation cannot, through his or her own conduct, create a defense by making the claimant a public figure. Otherwise private information is not turned into a matter of public interest simply by its communication to a large number of people. (*Weinberg, supra,* 110 Cal.App.4th at pp. 1132-1133.)

The precise boundaries of an issue of "public interest" have not been defined. Nevertheless, in each case where it was determined that an issue of public interest existed, "the subject statements either concerned a person or entity in the public eye [citations], conduct that could directly affect a large number of people beyond the direct participants [citations] or a topic of widespread, public interest [citation]." (*Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924.)

"Public interest" within the meaning of the anti-SLAPP statute is not limited to governmental matters. (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 115.) Rather, the term has been broadly construed to include private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity. (*Ibid*.) However, in the context of conduct affecting a "community," i.e., a limited but definable portion of the public, the constitutionally protected activity must, at a minimum, be connected to a discussion, debate or controversy. Merely informational statements are not protected. To grant such protection to such statements would in no way further "the statute's purpose of encouraging *participation* in matters of public significance." (*Id.* at p. 118.)

9.

*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468 (*Damon*) and *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456 (*Ruiz*), are examples of cases in which an issue is of interest to only a limited but definable portion of the public, a narrow segment of society consisting of members of a private group or organization. In *Damon*, the court found that the allegedly defamatory statements about the manager of a homeowners association governing 3,000 individuals in 1,633 homes pertained to issues of public interest within that particular community. Those statements concerned the very manner in which this group would be governed, "an inherently political question of vital importance to each individual and to the community as a whole." (*Damon, supra,* 85 Cal.App.4th at p. 479.) Similarly, in *Ruiz*, the court found that allegedly defamatory letters written in the context of a dispute regarding the application of the housing development's architectural guidelines involved an issue of public interest where it could affect the residents of approximately 523 lots. (*Ruiz, supra,* 134 Cal.App.4th at pp. 1468-1469.)

Here, at a minimum, the issues raised by Alex and Tim's allegedly defamatory statements are of interest to the community made up of the Church's members. The number of members, ranging from approximately 1,000 to approximately 550, is large enough to qualify as a "community" for purposes of section 425.16. (Cf. *Ruiz, supra,* 134 Cal.App.4th at pp. 1468-1469.) Considering that Church members donate money to the Church, allegations regarding theft and misuse of those funds is of concern to the membership. Such allegations could lead to discussion within the membership and the implementation of new financial standards. (Cf. *Gallagher v. Connell* (2004) 123 Cal.App.4th 1260, 1275 (*Gallagher*).) Further, as pastor of the Church, Bob is the members' spiritual and moral leader. As such, allegations regarding Bob's character and fitness to serve as a pastor are of interest to the membership.

This situation is analogous to consumer protection information. Alex and Tim were attempting to warn people away from attending the Church with Bob as the pastor.

10.

In the context of information ostensibly provided to aid consumers choosing among churches, the statements were connected to an issue of public concern. (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 900.)

Further, Alex and Tim did not limit their discussion to the Church. Rather, they raised the issue of child molestation and abuse in other churches in the Calvary Chapel organization. As found by the trial court, allegations of abuse by members of the clergy and the protection of children concern issues of public interest. (*Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1547.)

Accordingly, the trial court properly concluded that Alex and Tim's allegedly defamatory statements were made in a public forum in connection with an issue of public interest and therefore were entitled to protection under section 425.16, subdivision (e)(3). In light of this conclusion, it is unnecessary to determine whether these statements also fall within subdivision (e)(1), (2) and (4) of section 425.16.

**3.** ***Bob is not a limited purpose public figure in the context of the alleged defamation.***

The trial court concluded that Bob was a limited purpose public figure. The significance of this finding is that if Bob is a limited purpose public figure, Bob and Gayle must prove by clear and convincing evidence that Alex and Tim acted with actual malice to prevail on the defamation claims. (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 252-253 (*Reader's Digest*).)

There are two classes of public figures. "The first is the 'all purpose' public figure who has 'achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.' The second category is that of the 'limited purpose' or 'vortex' public figure, an individual who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.'" (*Reader's Digest, supra,* 37 Cal.3d at p. 253.) The issue here is whether Bob is a limited purpose public figure.

11.

Characterizing a plaintiff as a limited purpose public figure requires the presence of certain elements. (*Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1577 (*Ampex*).) First, there must be a public controversy about a topic that concerns a substantial number of people. In other words, the issue was publicly debated. (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 25 (*Gilbert*).) Second, the plaintiff must have voluntarily acted to influence resolution of the issue of public interest. To satisfy this element, the plaintiff need only attempt to thrust him or herself into the public eye. (*Ampex, supra,* 128 Cal.App.4th at p. 1577.) Once the plaintiff places him or herself in the spotlight on a topic of public interest, his or her private words and acts relating to that topic become fair game. (*Gilbert, supra,* 147 Cal.App.4th at p. 25.) However, the alleged defamation must be germane to the plaintiff's participation in the public controversy. (*Ampex, supra,* 128 Cal.App.4th at p. 1577.)

Bob characterizes the statements at issue as relating to allegations that he "abused his children, sexually molested his children, committed tax fraud, is a 'self-confessed' felony child abuser, and stole money from his church." Therefore, Bob argues, Alex and Tim were required to produce evidence that Bob affirmatively thrust himself into the public regarding the specific topics of child abuse, child molestation, tax evasion and stealing. According to Bob, he has not interjected himself into the public regarding any public controversy or dispute surrounding these topics or anything similar.

Bob relies on the *Gallagher* court's discussion of membership in the clergy and public figure status. In *Gallagher,* a parish priest assisted an elderly member of the parish with her financial affairs and thereafter became the primary beneficiary and successor trustee of the parishioner's living trust. With respect to the controversy that arose from this situation, the court stated "We have found no case which has held simply being a member of the clergy makes one an all-purpose public figure for purposes of a defamation action. We hold it does not." (*Gallagher, supra,* 123 Cal.App.4th at p. 1273.) The court noted that Gallagher was "no Jerry Falwell, Jesse Jackson, or Louis

Farrakhan." (*Ibid.*, fn. omitted.) There was no evidence that Gallagher had ever sought or received notoriety or public attention by reason of his position or achievements. (*Ibid.*) The court further concluded that Gallagher was not a limited purpose public figure because he did not thrust himself into the public controversy over who should be the successor trustee and beneficiary under the parishioner's trust. (*Ibid.*)

Bob, however, unlike Father Gallagher, has sought public attention as a pastor. Through his book, his radio program and his website, Bob promotes himself both within and outside of California as a spiritual leader guiding others on Christian morals in accordance with the Scripture. He has also been active in promoting local and regional church activities.

Nevertheless, although Bob thrust himself into the public eye as an expert on the Bible and its teachings, that alone did not cause him to become a limited purpose public figure in the context of this case. Bob's self-promotion as a spiritual leader guiding others on Christian morals did not open him up to public comment on private conduct that could be generally characterized as the antithesis of the morals he espouses, such as child abuse and theft. To hold that a member of the clergy can become a limited purpose public figure on any issue relating to morality simply because of his or her profession would be equivalent to holding that being a member of the clergy makes one an all purpose public figure. Such an interpretation of the limited purpose public figure doctrine is too broad. Rather, the plaintiff must have voluntarily acted to influence the resolution of a discrete public controversy. The subject of morality is too general and amorphous to qualify as such a controversy. Bob did not thrust himself into a public controversy or dispute regarding child abuse, child molestation, tax evasion or theft. Accordingly, contrary to the trial court's finding, Bob is not a limited purpose public figure for purposes of his defamation claims.

**4.**     *Bob and Gayle established the requisite probability of prevailing.*

To defeat Alex and Tim's anti-SLAPP motion, Bob and Gayle must demonstrate a probability of prevailing on their defamation claims.  This requires a prima facie showing of facts that would, if proved, support a judgment in their favor.  (*Navellier, supra,* 29 Cal.4th at pp. 88-89.)  Bob and Gayle need only establish that their claim has minimal merit to avoid being stricken as a SLAPP and we accept as true all evidence favorable to them.  (*Soukup, supra,* 39 Cal.4th at p. 291; *Walker v. Kiousis* (2001) 93 Cal.App.4th 1432, 1444.)

Defamation is the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or that causes special damage. (*Gilbert, supra,* 147 Cal.App.4th at p. 27.)  Thus, to state a defamation claim, the plaintiff must present evidence of a statement of fact that is provably false.  (*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 809 (*Seelig*).)  False statements that accuse the plaintiff of criminal conduct are defamatory on their face.  (*Weinberg, supra,* 110 Cal.App.4th at p. 1135.)

However, statements cannot form the basis of a defamation action if they cannot be reasonably interpreted as stating actual facts about an individual.  Thus, rhetorical hyperbole, vigorous epithets, lusty and imaginative expressions of contempt and language used in a loose, figurative sense will not support a defamation action.  (*Seelig, supra,* 97 Cal.App.4th at p. 809.)

Alex posted comments accusing Bob of theft, drug dealing, drug smuggling and being a self-confessed felony child abuser.  Tim stated that Bob "molested his own son." Thus, Alex and Tim made comments that can be reasonably interpreted as stating actual facts and that accuse Bob of criminal conduct.  Bob alleges these statements are false. Therefore, Bob has established that his defamation claims have minimal merit.

14.

Bob and Gayle have also demonstrated a probability of prevailing on their intentional infliction of emotional distress claims. Again, all that a plaintiff must do to defeat an anti-SLAPP motion is to establish the claim has minimal merit.

A plaintiff has stated a cause of action for intentional infliction of emotional distress when there is "'''"(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct."'''" (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001.) To be outrageous, the conduct must be so extreme as to exceed all bounds of that usually tolerated in a civilized community. (*Ibid.*) Mere insults, indignities, threats, annoyances, or petty oppressions are not sufficient. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1051.) Further, the plaintiff must prove that the emotional distress was severe and not trivial or transient. (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1376.)

Alex and Tim's statements are not mere insults, indignities, threats, annoyances, petty oppressions or other trivialities. Rather, they accuse Bob of criminal conduct that includes vile and depraved activities, i.e., child molestation. Further, there is a sufficient prima facie showing that these statements were directed at Bob and were calculated to cause Bob, and by her association with Bob, Gayle, severe emotional distress. Moreover, one of the alleged defamatory statements was specifically directed at Gayle.[3] Finally, Bob and Gayle declared that their reputations are ruined, they do not want to leave their residence, they have considered moving away to establish a life of anonymity, and they fear for their physical safety. Therefore, Bob and Gayle made a sufficient prima facie

---

[3] The complaint alleges Tim stated: "Bob Grenier should have his teeth knocked out as well as his wife should have [her] ovaries removed and reproductive organs removed and placed around her neck."

15.

showing that Alex and Tim's conduct was extreme and outrageous, was directed at them and that they suffered extreme emotional distress.

## DISPOSITION

The order denying Alex Grenier and Tim Taylor's motion to strike under section 425.16 is affirmed.  Costs on appeal are awarded to Bob Grenier and Gayle Grenier.

_____

LEVY, Acting P.J.

WE CONCUR:


_____

CORNELL, J.


_____

KANE, J.

16.