Filed 4/26/23  Vann v. Nunn CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MOST REVEREND KEVIN WILLIAM VANN et al., Plaintiffs and Respondents, v. SUZANNE NUNN, Defendant and Appellant. | G060498 (Super. Ct. No. 30-2020-01164434) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Frederick P. Horn, Judge.  (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Reversed with directions and remanded.

Dicks & Workman, Joseph G. Dicks, Linda G. Workman; Esner, Chang & Boyer, Holly N. Boyer, Shea S. Murphy, and Kathleen J. Becket for Defendant and Appellant.

Theodora Oringher, Todd C. Theodora, Andrew B. Breidenbach, Michael E. Bareket for Plaintiff and Respondent the Most Reverend Kevin William Vann; Ross, Wolcott, Teinert & Prout, Andrew G. Prout, and Traci G. Choi for Plaintiff and Respondent Elizabeth Jensen.

*     *     *

This is an appeal from an order denying a special motion to strike under the anti-SLAPP (strategic lawsuit against public participation) statute. (See Code Civ. Proc.,[1] § 425.16.) Shortly after being terminated, Suzanne Nunn (Nunn), the former interim executive director of a Catholic charitable foundation, sent an e-mail to dozens of Catholic leaders throughout the country suggesting the Most Reverend Kevin William Vann (Vann) had terminated her and all the foundation's board members because they had refused to release foundation funds to the Roman Catholic Church in the Diocese of Orange (the Diocese) for unauthorized purposes. Vann and the Diocese's chief financial officer (CFO), Elizabeth Jensen (Jensen), sued Nunn for libel and emotional distress, and Nunn in turn filed an anti-SLAPP motion to strike the complaint.

The trial court denied Nunn's motion after finding the complaint did not arise from protected activity. We disagree with that finding. We conclude Nunn's e-mail concerned several public issues: (1) Vann's alleged attempt to access millions of dollars of donations in contravention of donor agreements restricting the use of those funds for other charitable purposes; (2) Vann's alleged "take over" of the foundation's board of directors; and (3) the impact these alleged actions had on Catholics and other Orange County residents who rely on the foundation and the Diocese for support.

We therefore reverse and remand this matter with directions that the trial court consider prong two of the anti-SLAPP statute analysis in the first instance. As for

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise stated.

2

the court's evidentiary rulings, we affirm those rulings, except the ruling related to the exclusion of a declaration as improper expert testimony.

## FACTS

The following facts are taken from the complaint, declarations, and other evidence submitted on the special motion to strike. (See § 425.16, subd. (b)(2).) We note that it is challenging to provide a neutral summary of the facts because the parties present such different versions of what occurred.

The Orange Catholic Foundation (OCF) is a nonprofit fundraising organization that was formed in 2000 to support the philanthropic and charitable goals of Orange County's Catholic community. OCF manages millions of dollars in charitable gifts, grants, donations, endowments, and bequests, and it uses those funds to support Catholic charities, ministries, parishes, and schools. Many of OCF's donors earmark their donations for specific purposes in their donor agreements, and all OCF funds must be managed and distributed in accordance with those donor agreements and consistent with donor intent.[2]

OCF exists in large part to support the Diocese in fulfilling its mission, which includes helping the needy. However, OCF is fully independent from the Diocese and is governed by an autonomous board of directors (the OCF Board), who ensure OCF is honoring its covenants with its donors.

OCF's sole member is the Roman Catholic Bishop for the Diocese, plaintiff Vann. Under OCF's bylaws, as the sole member, the bishop in his discretion may "remove any member of the [OCF] Board of Directors . . . if that director . . . fails to act in accordance with, or acts in a manner contrary to, the objectives of [OCF] set forth in . . . [OCF's] Bylaws."

---

[2] At oral argument, the parties seemed to agree OCF's obligation to distribute funds in a manner consistent with donor intent is "sacrosanct."

3

Defendant Nunn is a nonprofit consultant who first joined OCF in 2010 to assist OCF's then executive director, Cindy Bobruk, in developing and implementing a giving and endowment program for OCF. Among her many duties, Nunn reviewed donor agreements and met with donors to clarify donor intent. Nunn's involvement with OCF increased in 2015 when Bobruk was diagnosed with cancer and required additional assistance while undergoing treatment.

After Bobruk passed away in April 2019, the OCF Board appointed Nunn to serve as OCF's interim executive director. Two of Nunn's primary responsibilities in that position were to assist OCF with searching for and hiring a permanent executive director, and to develop a strategic plan for OCF. Over the next year, however, Nunn did not make material progress toward either objective.

Meanwhile, in March 2020, the COVID-19 pandemic began to take hold, forcing the shutdown of Catholic schools and worship services and prompting a drop in tuition payments and collections for the Diocese. According to Nunn, on March 19, when California's stay-at-home order took effect, CFO Jensen asked OCF to give the Diocese $12 million from OCF funds, citing a 30-day working capital deficit at the Diocese. Nunn declined the request and explained that OCF did not have any undesignated funds. According to Nunn, Jensen replied that OCF had "buckets of money."

Three days later, Jensen sent a letter to the OCF Board's chairman asking OCF to give the Diocese roughly $2.6 million from endowment funds. In her letter, Jensen explained the funds were needed to cover "the ever-growing fiscal needs" of certain parishes and schools in light of "unprecedented times," while noting all distribution decisions "should respect the intent of the donors." Jensen provided additional information about the Diocese's cash flow problems in a follow-up e-mail to the chairman, noting that many parishioners and parents were being asked not to report to work and were therefore incapable of making Sunday contributions or tuition payments.

4

After seeking the advice of counsel, the OCF Board declined the Diocese's request for funds, citing restrictions in donor agreements, the need to honor donor intent, and the OCF Board's fiduciary duties as custodian of endowment funds. The OCF Board did agree to have OCF staff try to raise emergency funds and ask certain donors to ease restrictions to allow for immediate distribution. In late April, OCF granted about $1.5 million to the Diocese to support the churches and schools most impacted by the shutdown.

In early June, the bishop arranged for a Zoom meeting with the OCF Board's executive committee. What happened during that meeting is disputed. According to Vann, he expressed disappointment in the delays in the search for a permanent executive director and the lack of progress in establishing a strategic plan for OCF. According to Nunn, the bishop told the executive committee that Nunn was a liar, claimed that Nunn had single handedly caused irreparable damage to the relationship between OCF and the Diocese by refusing to invade endowment funds, and demanded that the OCF Board terminate Nunn's contract.[3]

On June 19, Vann fired the entire OCF Board without notice. He then reconstituted a new OCF Board, who in turn terminated Nunn's contract, appointed a new interim executive director, and began efforts to find a permanent executive director. A few days later, the bishop sent a letter to OCF donors announcing his decision "to bring new leadership to [OCF] by appointing a new board." His letter reported that the new board members were eager to develop a strategic plan and complete the search for a permanent executive director.

---

[3] The trial court sustained an objection to the portion of Nunn's declaration describing what occurred on the Zoom meeting, but we include Nunn's version of what occurred for context.

The bishop's reasons for terminating the OCF Board members are disputed. According to Vann, he removed them because they had failed to retain a new executive director, failed to make any meaningful progress in developing a strategic plan, and created a crisis of confidence during a global pandemic, when people needed OCF's services more than ever. According to Nunn, Vann terminated her and the OCF Board members because they had refused to distribute restricted OCF funds in response to Jensen's March request.

That brings us to the e-mail that is the focal point of this lawsuit. Several weeks after her termination, on July 7, Nunn sent a three-page e-mail to the 47 members of the Catholic Foundation CEO Forum, which includes leaders at Catholic foundations and dioceses across the country.[4] Her e-mail bore the subject line, "You can't make this stuff up." In the introductory paragraph, Nunn observed that there has been much focus "on protecting donor intent in light of the lifting of [the] statute of limitation on sexual abuse claims," that her situation involved "a different aspect to consider when protecting donor intent and assets," and that she was sending the e-mail "to create an awareness of a situation that completely caught our board of directors off guard." She added, "The following should start with 'Once upon a time' . . . it sounds like fiction, but it is not."

---

[4] According to the complaint, many of these individuals are persons "whose opinions [a]re critical in the community of United States Catholic fundraising leadership." By way of example, the e-mail was sent to the Diocese of Albany, New York, the Archdiocese of Portland, Oregon, the Roman Catholic Foundation of St. Louis, Missouri, the Catholic Foundation of Dallas, Texas, and the Catholic Foundation of Michigan.

In the past, members of the forum had exchanged e-mails on topics of common interest; for example, in May 2019 an e-mail was circulated to the forum members attaching a 2019 Catholic Foundations CEO Symposium presentation entitled, *Is my gift safe?*, which discussed (among other things) how a diocese's bankruptcy might affect donors.

Nunn's e-mail described Jensen's letter at the beginning of the pandemic asking the OCF Board to distribute OCF funds to assist with a working capital deficit, the OCF Board's denial of the request based on the terms of the donor agreements, how Vann was "[d]isappointed in the rejection," and how the bishop subsequently terminated all OCF Board members and reconstituted a new board. The e-mail observed that Vann claimed to have the authority as the sole member of OCF to remove all the OCF Board members, and then quoted the provision from OCF's bylaws regarding removal of board members.

Nunn's e-mail then concluded with a series of rhetorical questions: "Is this considered a hostile take-over to distribute funds the diocese needs to cover debt? Lawsuits? Is this an overstep of authority? Is this the result of fatigue from the economic impact of the COVID crisis in addition to other financial stress? No one knows, it certainly was not shared or discussed prior to the removal of the Foundation board. No individual meetings to discuss this in detail, no dialogue, only a letter read on a Zoom call and an immediate departure. No response to requests for individual meetings with the Foundation board chair, only silence. [¶] Does the Foundation Board have a fiduciary responsibility to fight this takeover to protect the donor intent and Foundation assets? All funds are irrevocably given to the Foundation. When the donor is the parish the funds are initially given after alienation is approved and documented. [¶] Could this happen to you if this precedence is determined acceptable? All rhetorical questions, but something to consider."

Vann and Jensen (Plaintiffs) felt personally attacked by Nunn's e-mail, which they interpreted as criticizing their financial integrity, accusing them of misappropriating and misdirecting the use of OCF funds, and insinuating through innuendo and rhetorical questions that they might have used those funds for the cost of defending child sex abuse lawsuits. They believed Nunn's e-mail tarnished their

7

reputations in the community and jeopardized their ability to serve the needy.[5] Plaintiffs believed Nunn sent the e-mail to undo the damage to her reputation and increase her potential job prospects with other Catholic institutions.

Plaintiffs retained counsel, accused Nunn of defamation, and demanded that she send a retraction. Nunn did not respond.

Plaintiffs then filed the present lawsuit against Nunn for libel per se and intentional infliction of emotional distress. Plaintiffs' complaint alleges Nunn's e-mail could be reasonably understood to imply they had committed a crime and engaged in unethical activities, and they seek a public pronouncement that they never violated donor intent, never used OCF funds to pay for lawsuits or debts involving the Diocese, and never used OCF funds for unauthorized or illicit purposes.

Nunn filed an anti-SLAPP motion to strike,[6] arguing among other things that her July 7 e-mail was protected speech because it concerned issues under consideration by governmental bodies across the country (see § 425.16, subd. (e)(2)), and because it concerned issues of public interest (see *id.*, subd. (e)(4)), including charitable foundations' duty and desire to protect donor intent, the breach of public trust in nonprofit funding, the need to protect restricted charitable donations from being used to fund the cost of defending child sex abuse claims against the Catholic Church, and the lifting of the statute of limitations on those claims. In support of her motion, Nunn submitted nearly 1,000 pages of declarations and other evidence, including a declaration by retained expert Patrick J. Wall, a former Catholic priest who now helps investigators and prosecutors in actions against various dioceses and priests.

---

[5] During oral argument counsel for the bishop repeatedly characterized the contents of the e-mail as "dirty laundry."

[6] Nunn also filed a cross-complaint for inducing breach of contract, intentional interference with contractual relations, and intentional and negligent interference with prospective economic advantage.

8

Plaintiffs opposed the anti-SLAPP motion and also filed over one hundred evidentiary objections to Nunn's supporting evidence.

On reply, Nunn submitted over 600 pages of additional evidence, including dozens of supplemental exhibits and about ten supplemental declarations. Plaintiffs objected to that additional evidence.

After hearing oral argument and taking the matter under submission, the trial court sustained 29 out of Plaintiffs' 101 objections to evidence, excluded the entire declaration of Nunn's expert as improper expert testimony, and excluded all evidence Nunn submitted on reply. The court then denied Nunn's anti-SLAPP motion, finding she had failed to show the complaint arose from protected activity. Among other things, the court reasoned that Nunn's e-mail did not concern an issue of public interest, but rather concerned Vann's "termination of Board members at *one* Catholic foundation due to his alleged disappointment with the [OCF] Board's decision to deny the CFO of the Orange County Diocese's request to distribute funds." (Italics added.)

Nunn appealed, challenging both the evidentiary rulings and the denial of her motion.

## DISCUSSION

1.   *The Anti-SLAPP Statute*

The Legislature enacted the anti-SLAPP statute in 1992 to address "what are commonly known as SLAPP suits (strategic lawsuits against public participation)—litigation of a harassing nature, brought to challenge the exercise of protected free speech rights." (*Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 665, fn. 3.) The statute authorizes a special motion to strike meritless claims early in the litigation if the claims "aris[e] from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . ." (§ 425.16, subd. (b)(1).) The statute

9

is "'intended to resolve quickly and relatively inexpensively meritless lawsuits that threaten free speech on matters of public interest.'" (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619.)

When evaluating a special motion to strike, the trial court must engage in a two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . [Citation.] If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)

"At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them. When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at this stage." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 (*Baral*).)

"If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached. There, the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated. The court, without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment. If not, the claim is stricken. Allegations of protected activity supporting the stricken claim are eliminated from the complaint, unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing." (*Baral, supra,* 1 Cal.5th at p. 396.)

We review a trial court's order denying an anti-SLAPP motion de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325 (*Flatley*).) The statute requires us

10

to "consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) We therefore consider not only the complaint, but also the declarations filed in support of and in opposition to the anti-SLAPP motion. We do not weigh the credibility of that evidence, and we """"accept as true the evidence favorable to the plaintiff[s]."""" (*Flatley, supra,* at p. 326.)

2. *Prong One: Protected Activity*

Under prong one of the anti-SLAPP analysis, we must decide whether Nunn made a threshold showing that Plaintiffs' claims arise from an act in furtherance of Nunn's right of petition or free speech in connection with a public issue. (§ 425.16, subd. (b)(1).) That is, did Nunn establish the complaint arises from protected activity?

As is relevant here, the anti-SLAPP statute defines protected activity to include "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" (§ 425.16, subd. (e)(2)), and also to include "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest" (*id.*, subd. (e)(4)).[7]

At this point, we must pause to clarify what Nunn's e-mail said and also what it did not. As we read Nunn's e-mail, its gist is that Plaintiffs tried to convince OCF leadership to release donor funds contrary to restrictions in donor agreements and then retaliated against Nunn and the OCF Board members for not doing so. Nowhere does the three-page e-mail state that Plaintiffs planned to use those funds to litigate sexual abuse claims. Indeed, in the opening paragraph of the e-mail, Nunn wrote that there has been much focus "on protecting donor intent in light of the lifting of [the] statute of limitation

---

[7] At oral argument, Nunn's counsel indicated his primary reliance in seeking a reversal of the trial court's ruling was section 425.16, subdivision (e)(4).

11

on sexual abuse claims" and that her e-mail would discuss "*a different aspect* to consider when protecting donor intent and assets." (Italics added.) The e-mail then goes on to describe Jensen's request for funds, the OCF Board's denial of the request, and the bishop's unilateral decision to terminate Nunn and the entire OCF Board. It concluded, as quoted above, with a series of rhetorical questions, including whether Plaintiffs' actions constituted "a hostile take-over to distribute funds the diocese needs to cover debt [or] [l]awsuits," but it does not answer those questions, instead stating "No one knows." When read as a whole, the e-mail alleges Plaintiffs took over the OCF Board so they could access OCF funds for unknown, unauthorized purposes, not that Plaintiffs used those moneys to fund sexual abuse litigation.

Having clarified that point, we can quickly dispose of Nunn's initial argument that her e-mail concerned the litigation of child sex abuse claims against the Catholic Church or the lifting of the applicable statute of limitations, and thus involved "an issue under consideration or review by a . . . judicial body" (§ 425.16, subd. (e)(2)). As the trial court stated in its minute order denying Nunn's motion, "The July 7, 2020 email did not concern the statute of limitations in sexual abuse cases whatsoever," and there was "no evidence that any government agency was discussing the issue of donor funds in contravention of donor intent or the use of donor funds to pay for child sex abuse litigation defense." We agree. The claims therefore do not arise from protected activity within the meaning of section 425.16, subdivision (e)(2).

We now turn our attention to section 425.16, subdivision (e)(4). As noted, this provision defines protected activity to include "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) This "'catchall' provision [is] meant to round out the statutory safeguards for constitutionally protected expression." (*FilmOn.com Inc. v. DoubleVerify Inc*. (2019) 7 Cal.5th 133, 144 (*FilmOn*).)

12

Our Supreme Court has articulated a two-part inquiry for deciding whether a claim arises from protected activity within the definition of section 425.16, subdivision (e)(4):  first, we look to the content of the speech and ask what public issue the speech implicates; second, we ask whether the speech contributes to a public discussion of any such issue.  (*FilmOn, supra,* 7 Cal.5th at pp. 149-150; see *Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1243 (*Geiser*).)

"*FilmOn*'s first step is satisfied so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute." (*Geiser, supra,* 13 Cal.5th at p. 1253.)  Relevant considerations might include "whether the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the direct participants' [citation]; and whether the activity 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation], or 'affect[ed] a community in a manner similar to that of a governmental entity' [citation]." (*FilmOn, supra*, 7 Cal.5th at pp. 145–146.)

The topic of discussion need not be significant or affect society as a whole; it need only be of interest to a definable subgroup of society, such as a school, church, homeowners' association, or labor union.  (See, e.g., *Hicks v. Richard* (2019) 39 Cal.App.5th 1167, 1172, 1176 [concerned parents' letter to Catholic bishop calling for investigation of Catholic school principal implicated "issues of public interest, including providing schoolchildren with an appropriate education and protecting them and school employees from abuse, bullying, and harassment"]; *Colyear v. Rolling Hills Community Assn. of Rancho Palos Verdes* (2017) 9 Cal.App.5th 119, 132–133 ["there was an ongoing controversy, dispute, or discussion regarding the applicability of tree-trimming covenants to lots not expressly burdened by them, and the HOA's authority to enforce such covenants"]; *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 476, 483 (*Grenier*) [internet posts accusing church pastor of stealing funds from church concerned matter of

public interest]; *Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 738 [union agent's alleged misappropriation of union funds was of interest not only to union officials but also to the over 10,000 union members]; *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1548 [the protection of children in church youth programs is an issue of public interest].)

*FilmOn*'s second step is satisfied if there is a functional relationship between the challenged activity and the public conversation related to that issue, and the speech contributes to the public discussion of that issue. (*Geiser, supra*, 13 Cal.5th at p. 1249; see *FilmOn, supra,* 7 Cal.5th at p. 150 ["'it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate'"].) "What it means to 'contribute to the public debate' [citation] will perhaps differ based on the state of public discourse at a given time, and the topic of contention. But ultimately, our inquiry does not turn on a normative evaluation of the substance of the speech. We are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*Id.* at pp. 150–151.)

Applying these authorities here, we conclude Nunn's e-mail qualifies as protected activity under section 425.16, subdivision (e)(4). At its core, Nunn's e-mail concerned Vann's alleged efforts to access OCF funds in contravention of donor agreements, his alleged disappointment in the OCF Board's rejection of the Diocese's request to release endowment funds, and his allegedly unauthorized removal of the OCF Board members. While not matters of statewide concern, these issues are necessarily the subject of widespread local interest. As Plaintiffs recognize, the bishop serves over 1.3 million Catholics in Orange County, and Jensen, as the Diocese's CFO, oversees financial leadership teams at 64 parishes and 33 schools. Plaintiffs' alleged attempt to

14

use donor funds in contravention of donor agreements impacts not only the donors themselves, but also thousands of Catholic parishioners and other residents of Orange County who rely on OCF funding and who depend on the bishop and the Diocese for spiritual support and guidance. Nunn's July 7 e-mail contributed to discussions that were ongoing (as evidenced by Vann's June 22 letter to OCF donors regarding the leadership change) about why Vann had terminated the OCF Board members. Considering both the content and context of Nunn's e-mail (see *FilmOn, supra*, 7 Cal.5th at p. 149), we conclude Nunn's e-mail concerns a public issue within the meaning of subdivision (e)(4).

Our analysis is consistent with the Fifth District's prong one analysis in *Grenier, supra*, 234 Cal.App.4th 471. *Grenier* involved a pastor at a nondenominational church in Visalia with roughly 550 to 1,000 members. (*Id.* at p. 476.) A member of the church began discussing the pastor in an online forum, and the pastor's adult son posted similar comments online. Their comments included that the pastor had stolen money from the church, had engaged in child abuse and molestation, had smuggled drugs, and was otherwise untrustworthy. (*Id.* at pp. 477–478.) The pastor sued the posters for defamation and emotional distress, and the posters in turn filed an anti-SLAPP motion. The trial court found the claims arose from protected activity. (*Id.* at p. 479.)

The *Grenier* court reasoned that "at a minimum, the issues raised by [the posters'] allegedly defamatory statements are of interest to the community made up of the Church's members. The number of members, ranging from approximately 1,000 to approximately 550, is large enough to qualify as a 'community' for purposes of section 425.16. [Citation.] Considering that Church members donate money to the Church, allegations regarding theft and misuse of those funds is of concern to the membership." (*Grenier, supra,* 234 Cal.App.4th at p. 483.) The court also analogized the postings to statements about "consumer protection information. [The posters] were attempting to warn people away from attending the Church with . . . the pastor. In the context of

15

information ostensibly provided to aid consumers choosing among churches, the statements were connected to an issue of public concern." (*Ibid.*)

The same observations apply here and are all the more persuasive given the amount of money OCF manages and the size of the Diocese's membership. Whether Plaintiffs attempted to use OCF funds in a manner contrary to donor intent is relevant not only to OCF donors, but also to the Diocese as a whole. Construing "public interest" broadly, as we must (see *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1145), we conclude Nunn met her burden on prong one to show her e-mail qualifies as protected activity.

### 3. *Prong Two: Probability of Prevailing*

Because the trial court found Plaintiffs' claims did not arise from protected activity, it did not undertake the prong two analysis to determine whether Plaintiffs established a probability of prevailing on their claims. We decline Plaintiffs' request that we consider that question in the first instance and instead remand the matter for the trial court to resolve. (See *Collier v. Harris* (2015) 240 Cal.App.4th 41, 58.) We express no view on Plaintiffs' probability of prevailing.

### 4. *Evidentiary Issues*

#### a. *Wall's Declaration*

We now turn to the evidentiary issues. Nunn first challenges the trial court's exclusion of the declaration from her expert, Patrick Wall, as improper expert testimony.[8] As noted, Wall is a former Catholic priest who now assists prosecutors in preparing actions against various dioceses and priests. According to his declaration, Wall was retained to "offer an opinion on whether the factual predicate asserted by the

---

[8]    The trial court did not rule on Plaintiffs' objection nos. 48-101 to Wall's declaration, noting that its decision to exclude the entire declaration as improper expert testimony mooted those objections.

16

Plaintiff's [*sic*] exists in this case," and his declaration purports to "present facts to aid the Court in its determining if the Plaintiffs were harmed and whether the described and alleged conduct of [Nunn] is protected speech." The declaration then goes on to describe the history of the Diocese and OCF, Vann's appointment, and the history of sexual abuse lawsuits against the Catholic Church. It concludes with Wall's opinion that Nunn was sued because she "exposed the Church's playbook for shielding, hiding and offloading Billions of dollars in assets . . . in a coordinated effort to either escape civil claims of child sexual assault by the Clergy, or accessing the otherwise legitimately donated funds."

We agree with the trial court that the opinions expressed in Wall's declaration about Plaintiffs' motive for suing Nunn (e.g., paragraph 46) are improper opinion testimony. (See *Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 294 [expert opinion regarding an employer's motives for terminating an employee would invade the province of a jury]; Evid. Code, § 801, subd. (a) [expert opinion is only admissible if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact"].)

However, the majority of Wall's declaration consists not of his speculation related to the reasons for Nunn's termination, but what purports to be factual information about OCF, the Diocese, internal church procedures,[9] and the history of sexual abuse litigation. Although evidence about sexual abuse cases against the church is likely of limited relevance here given our finding that Nunn's e-mail did not concern sexual abuse

---

[9] See *Stevens v. Roman Catholic Bishop of Fresno* (1975) 49 Cal.App.3d 877, 883 [evidence on church bylaws and internal rules and regulations may be introduced through expert testimony].

litigation funding, other factual information in Wall's declaration could theoretically help the trial court determine if Plaintiffs are likely to succeed on their claims for libel.

Accordingly, we conclude that striking the entirety of Wall's declaration as improper expert testimony constituted an abuse of discretion. On remand the trial court is directed to consider Plaintiffs' remaining objections to Wall's declaration (objection nos. 48-101) to determine to what extent, if any, the declaration is admissible.

b.      *The "Blanket" Sustaining of 29 Out of 101 Objections*

Nunn next contends the trial court abused its discretion in its "blanket ruling" on Plaintiffs' objection nos. 2, 4-13, 17, 21-25, 29-31, 33, 35, 36, 40-44, and 47. In most of those objections, Plaintiffs listed several grounds for objection (e.g., lacks foundation, lacks personal knowledge, irrelevant, and prejudicial). The court sustained those objections without explanation and without specifying the ground or grounds for its ruling.

Nunn contends the trial court abused its discretion in "blanket granting these objections with no indication what the basis of the rulings were." (See *Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1449 (*Palms*) [blanket ruling sustaining, without explanation, all 48 pages of objections to seven-page declaration, where multiple bases were cited for each objection, was an abuse of discretion]; *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 255 [blanket ruling sustaining 763 out of 764 objections without explanation was "manifest error"].)

We disagree. We are not convinced the trial court's ruling constitutes a "blanket" sustaining of objections; the court sustained only 29 out of 101 objections, which suggests the court considered each objection individually.

Further, while Nunn is correct that the trial court did not explain the basis for sustaining those 29 objections, "an erroneous evidentiary ruling requires reversal only if 'there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*Palms, supra,* 210 Cal.App.4th

18

at p. 1449.)  Here, Nunn does not provide any argument as to why sustaining any of those 29 objections was erroneous.  She therefore waived any argument of prejudice.  (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368 ["One cannot simply say the court erred, and leave it up to the appellate court to figure out why"].)

   c. *Nunn's Evidence on Reply*

  Finally, Nunn contends the trial court erred in excluding all evidence on reply.  We disagree.  "The general rule of motion practice, which applies [to anti-SLAPP motions], is that new evidence is not permitted with reply papers."  (*Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522, 1537.)  Although Nunn had a right to file reply declarations, those declarations "should not have addressed the substantive issues in the first instance but only filled gaps in the evidence created by [Plaintiffs'] opposition."  (*Id.* at p. 1538.)  Nunn does not endeavor to explain how the hundreds of pages of new evidence only "supplemented" her initial moving evidence.  "Thus, while the trial court had discretion to admit the reply declarations, it was not an abuse of discretion to decline to do so."  (*Ibid.*)

## DISPOSITION

  The trial court's order denying Nunn's special motion to strike is reversed.  On remand, the court is to consider and rule on Plaintiffs' remaining evidentiary objections to the Wall declaration, and then to consider prong two of the anti-SLAPP

statute analysis.  Nunn shall recover her costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)


                                    GOETHALS, ACTING P. J.

WE CONCUR:


MOTOIKE, J.


DELANEY, J.